## State of Vermont v. John Grega

[721 A.2d 445]

No. 96-106

Present: **Gibson, Dooley, Morse and Johnson, JJ., and Allen, C.J. (Ret.),** **Specially Assigned**

Opinion Filed April 10, 1998

Amended on Motion for Reargument October 7, 1998

*Jeffrey L. Amestoy*, Attorney General, and *David Tartter*, Assistant Attorney General, Montpelier, for Plaintiff-Appellee.

*Charles S. Martin* of *Martin & Paolini*, Barre, for Defendant-Appellant.

**Johnson, J.** Following a jury trial, defendant was convicted of aggravated murder, 13 V.S.A. § 2311(a)(8), and aggravated sexual assault, 13 V.S.A. § 3253(a)(1), of Christine Grega, his wife. On appeal, defendant challenges his convictions, arguing that the trial court erred by (1) denying defendant's request for production of the criminal records of the members of the jury pool; (2) seating one member of the jury, over defendant's objection; (3) denying defend-

ant's motion for mistrial and change of venue, following a remark by a member of the jury pool; (4) denying defendant's motion to suppress evidence obtained by police during searches of the condominium in which the victim was murdered; (5) excluding certain evidence that according to defendant supports his claim that someone else murdered his wife; (6) refusing to grant immunity to a defense witness; (7) denying defendant's motion for judgment of acquittal; and (8) denying defendant's motion to preclude the imposition of sentence for his conviction of aggravated sexual assault. Defendant also claims that the trial judge failed to display a proper judicial demeanor and should have been disqualified. We affirm both convictions and his mandatory sentence of life in prison without the possibility of parole for aggravated murder, but vacate defendant's sentence for aggravated sexual assault.

## I.

Defendant, a resident of New York, drove to Vermont on September 10, 1994, for a vacation with his wife and young son. The family stayed in a condominium near Mount Snow that they had borrowed from a friend. Defendant later told police that the couple had discussed divorcing, and that one reason for the trip was to get the marriage back on track. According to defendant, the family spent their first two days in Vermont engaging in typical vacation activities.

On September 12, 1994, around 8:30 pm, a police officer responded to an emergency call reporting that a woman had fallen in a bathroom. When the officer entered the Gregas' condominium, he found defendant in the bathroom straddling the victim's body. Defendant was emotionally upset, calling out his wife's name, shaking her, and crying. The victim was lying on her back on the floor of the bathroom, with her head near the door and her feet near the tub. She was nude, but partially covered by a towel and blanket. According to the officer, the victim's body was "purplish, bluish, gray" in color and extremely cold, which surprised him, because the bathroom heater was running and the bathroom was very hot. The officer also noticed bruising on the victim's upper body. The officer concluded from the victim's body temperature and his other observations that it was too late to attempt to resuscitate the victim. A rescue worker who arrived a few minutes later did attempt CPR, unsuccessfully.

An autopsy of the victim revealed blunt trauma injuries to the head, face, neck, trunk, and extremities. The neck area had suffered extensive internal and external injuries. There were also multiple

lacerations in the anal/rectal region. The medical examiner concluded that the cause of death was asphyxia, and classified the death as a homicide. A forensic pathologist called by the State testified that the anal injuries were caused by a foreign object about twice the size of a normal penis, such as a fist, pipe, or baseball bat, that was inserted in the rectum with a moderate to severe amount of force.

Police searches of the crime scene and condominium unit revealed additional evidence. The condominium was unusually clean for a crime scene and had apparently been wiped down. There were no signs of a struggle or forced entry. The washing machine was stopped mid-cycle, half-full of soapy water, and contained several towels and some clothing. The clothing, which included a full set of women's clothes and a full set of men's clothes, matched the clothing worn by defendant and the victim in photos taken the day of the murder. The pair of men's shorts was missing a button that was present when the photos were taken. Investigators found money and a pair of keys in the pair of women's blue jeans. A pair of women's underwear, a pair of men's shorts, and a towel found in the washer all tested positive for blood. Forensic testing of the clothing and blood was hindered, however, because the clothing had been soaking in soapy water, which dissolved proteins.

A search of the common trash receptacle for the condominium complex turned up a garbage bag identical to those found inside the condominium unit. The bag contained beer cans, some empty and some full, one of which carried defendant's fingerprints. The garbage also contained paper towels that appeared to be stained with blood, and a panty liner that tested positive for blood. A rescue worker discovered that the toilet in the upstairs bathroom of the condominium was stopped up. The toilet eventually had to be broken to discover the source of the blockage. It contained a wad of paper towels. Investigators also found a piece of cardboard from a box of Marlboro cigarettes stuck to the inside of the toilet.

Defendant spoke with police several times during the investigation. According to defendant's statements the night his wife was killed, he left the condominium with his son in the late afternoon to give his wife a chance to relax. He took his son to a nearby school playground, and then drove around looking for a place to eat. They stopped at an ice cream stand, but it was closed. After about an hour and a half, they returned to the condominium. Defendant was not exactly sure what time they returned, but thought it was around 7:00 pm. He recalled that it was getting dark and his son was sleeping. The door to the

condominium unit was unlocked, and he entered quietly, not wanting to disturb his wife if she was napping. He left his son sleeping in the car. He went downstairs to look for his wife and found her in the bathroom. He could not remember whether his wife was partially out of the tub, or whether she was face down or face up. He did remember that the tub was partially full, and that he pulled his wife out of the tub and laid her on the floor. He tried to resuscitate her, and then ran next door to have the neighbors call an ambulance. He brought his son over to the neighbors, and then returned to his wife. At some point he covered his wife up with a blanket.

Later that night, having learned of the victim's anal injuries, an officer questioned defendant about his sexual relations with his wife. At first he stated that he and his wife had sex twice that morning; later in the same interview he stated that they had vaginal sex once in the morning and anal sex once that afternoon, before defendant left with his son. Defendant commented on the large size of his penis, claiming that prostitutes had turned him away because of its size, and stated that his penis may have had blood on it after he withdrew from the anal sex. He permitted the officers to examine his penis, and the officers observed no bruising and saw no blood on his penis or his underwear.

The police questioned defendant again the next evening. When asked about the injuries to his wife's neck, defendant explained that he sometimes grasped his wife's neck during sex, and she would say "stop" if it was too rough. He stated that he did this during sex on the day his wife died. He also said that his wife's head injuries may have been caused by her hitting a wall or the bed during sex.

Defendant gave a final statement to the police the next month, in the presence of his attorneys. His description of the timing of events changed somewhat, with defendant claiming that the episode of anal sex and his trip with his son occurred later in the day than he had originally stated. At this point he also said that he did not have his hands around his wife's neck while having sex with her, and that after sex his wife was in fine condition, not disabled or in pain, and had dressed again in her jeans and golf shirt.

In December, 1994, defendant was charged with second-degree murder of his wife. He pled not guilty. The information was later amended to charge defendant with aggravated murder and aggravated sexual assault. After a lengthy trial, a jury found defendant guilty on both counts. The court sentenced him to life without parole on the aggravated murder charge, and fifty years to life on the aggravated-sexual-assault charge. This appeal followed.

## II.

We begin by addressing defendant's claims of error with respect to the jury selection process. Defendant first argues that he was entitled to review the criminal records of potential jurors that were obtained by the State. He relies on V.R.Cr.P. 16, which requires the State to disclose "material or information not protected from disclosure . . . that is necessary to the preparation of the defense." The State refused to release the criminal record checks, and the court declined to order the State to do so.

Courts in other jurisdictions have held that the defense should have the same access to criminal record checks of potential jurors that the State has, as a matter of fairness. See, e.g., *Tagala v. State*, 812 P.2d 604, 612-13 (Alaska 1991) (collecting cases). We need not reach this issue, however, because defendant has made no showing that he was prejudiced by the State's failure to disclose the results of the criminal record checks. See *State v. Jones*, 160 Vt. 440, 446, 631 A.2d 840, 845 (1993) ("To establish reversible error under V.R.Cr.P. 16, a defendant must show both a violation of the rule and resulting prejudice."). Potential jurors were asked about their criminal records on the juror questionnaires, and defense counsel was free to inquire on the subject during voir dire. Defendant does not claim that any of the jurors gave inaccurate or incomplete information, nor has he shown that the impanelled jury was biased in any way.

Next, defendant argues that the court erred by refusing to remove for cause a juror who was a patient of the physician who conducted the preliminary examination of the victim's body. Defendant relies on our decision in *State v. Doleszny*, 146 Vt. 621, 508 A.2d 693 (1986), where we held that a juror should be removed for cause where the juror "indicates an inclination to believe or disbelieve the testimony of someone he knows." *Id.* at 622, 508 A.2d at 694. The juror in that case stated during voir dire that he was not certain he could be impartial, and that his prior knowledge of the witness might weigh heavily in the witness's favor.

Our holding in *Doleszny* does not apply here. Unlike the juror in *Doleszny*, the juror here did not say that she would be more likely to believe the doctor because of her prior knowledge. She did state that she respected the doctor, and would be upset if someone said that he did something wrong, perhaps enough to stop going to him. She also stated, however, that she would not hold such a criticism against the State or the defense, but against the doctor himself. When asked

how she would react if his actions were in dispute, she explained that she would have to hear both sides and then make a decision. Absent some evidence of bias on the part of the juror, we will not disturb the trial court's ruling. See *State v. Hohman*, 138 Vt. 502, 511, 420 A.2d 852, 857-58 (1980), *overruled on other grounds, Jones v. Shea*, 148 Vt. 307, 308-09, 532 A.2d 571, 572 (1987) (whether juror entertains opinion that is truly fixed bias is question for sound discretion of trial judge; absent indication of bias in record, we will not upset decision of trial judge who observed demeanor of juror during voir dire). For the same reasons, we reject defendant's claim that the trial court should have granted defendant additional peremptory challenges to exercise against this and one additional juror.

Defendant's last argument regarding the jury involves one potential juror's comment during voir dire that "I believe [the defendant is] guilty and they ought to hang him anyway." Other jurors were present at the time and heard the comment. Defendant claims that the comment tainted the jury pool and prevented defendant from receiving a fair trial. He argues that the court should have granted his motions for mistrial and change of venue.

In general, the decision to grant or deny a new trial is entrusted to the discretion of the trial court, and will not be disturbed on appeal absent a showing that the court abused or withheld its discretion. *State v. McKeen*, 165 Vt. 469, 472, 685 A.2d 1090, 1092 (1996). In analogous circumstances, we recently emphasized that the trial judge is in the best position to determine whether a jury has been tainted, and "[c]onsequently, every reasonable presumption in its favor is accorded to the ruling below." *Id.* at 472, 685 A.2d at 1093. We apply a similarly deferential standard to a trial court's ruling on a motion for change of venue. *State v. Chenette*, 151 Vt. 237, 252, 560 A.2d 365, 375 (1989).

Defendant has not shown that the trial court abused its discretion in denying his motions for mistrial and change of venue. The judge cautioned the jury pool that the comment was inappropriate, and emphasized that defendant was presumed innocent of the charges against him. She then questioned each juror who heard the comment, asking whether the juror would be able to ignore the comment in making a decision. The record is devoid of any evidence that this isolated comment made weeks before the jury began deliberations affected the jury's ability to make a fair and impartial decision. We therefore see no ground for disturbing the trial court's denial of the motion for mistrial. See *Evans v. Young*, 854 F.2d 1081, 1084 (7th Cir.

1988) (although several jurors overheard remark of passerby that "we ought to hang him," new trial not required because voir dire indicated no prejudice and court gave curative instruction); *United States v. Ortiz*, 603 F.2d 76, 80 (9th Cir. 1979) (reversal not required where prospective juror remarked concerning heroin dealers that "[i]f I had my way, I would hang them if they were guilty"), *cert. denied*, 444 U.S. 1020 (1980); *State v. Brown*, 434 So. 2d 1166, 1168 (La. Ct. App. 1983) (where prospective juror who stated, "What tree are we going to hang him on?" was chastised and removed for cause, and remaining jurors were instructed to disregard remark, no error in denial of mistrial).

■ Nor do we accept defendant's claim that the prospective juror's comment reflected community feeling so biased against him that he was unable to receive a fair trial without a change of venue. See V.R.Cr.P. 21(a) (request for change of venue should be granted where court "is satisfied that there exists in county or unit where the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial there"). Defendant presented no evidence of this widespread bias, and again, the record of the jury voir dire reflects no bias or prejudice against defendant on the part of the jury members. We conclude that the court acted well within its discretion in denying the motion for change of venue. Cf. *State v. Winters*, 136 Vt. 469, 470-71, 392 A.2d 429, 430 (1978) (trial court's denial of motion for change of venue sustained where only evidence in support of motion were two newspaper accounts referring to defendant and others as "escapees").

## III.

Over the days following the victim's death, police conducted a number of searches of the condominium. Defendant maintains that most of the searches were illegal. He argues that the trial court should have granted his motion to suppress the fruits of those searches.

Before considering defendant's claims, we set out in more detail the circumstances surrounding the contested searches. On September 13, the day after the murder, an officer met with defendant to seek his consent to search the condominium and the car. The officer filled out a consent form and read it to defendant, who signed it willingly. Defendant did not limit his consent or withdraw consent at any time. On the same day, police applied for and received a warrant to search

the condominium and the car. Late that night, defendant left Vermont and returned to Long Island.

The police executed the warrant on September 13, and seized a number of items from the condominium and the car. Several investigators visited the unit the next day, staying about an hour. They did not seize any items, but walked around the condominium, checked the mattresses for blood stains, and tested the operation of the bathtub. Two officers returned on September 15, to check the sewer line for foreign objects. The officers also looked through trash bags in the common trash receptacle, looking for clothing worn by the victim in photographs taken during the Gregas' stay in Vermont. The officers found other items in the trash bags, but no clothing. They then searched the condominium and seized two articles of women's clothing.

On September 19, police sought and received a second warrant to search the condominium. The affidavit in support of that warrant referred to the contents of the trash bags, as well as many other details uncovered during the investigation. Upon execution of that warrant, police seized additional pieces of evidence, primarily clothing.

Defendant does not contest that the initial search on September 13 was permissible, based both on his consent and on the search warrant. He argues, however, that the subsequent warrantless searches on September 14 and 15 exceeded the scope of his consent. See *State v. Connolly*, 133 Vt. 565, 570-71, 350 A.2d 364, 368 (1975) (scope of permission to search may be limited, and exceeding such scope does not differ in principle from search without permission). He further argues that once police obtained the first warrant, they could no longer rely on his consent as authorization for subsequent searches.

■ Based on the circumstances of this case, we agree with the trial court that the September 14 and 15 searches did not exceed the scope of defendant's consent. As a preliminary matter, we reject defendant's claim that once a search warrant issued, police could no longer rely on defendant's consent. If police choose to obtain both a valid search warrant and proper consent for a search, then they have the benefit of two legal bases for a search. Without some evidence that defendant withdrew his consent, the mere fact that police obtained a warrant does not automatically negate defendant's consent. See *State v. Brown*, 293 S.E.2d 569, 582 (N.C. 1982) (fact that police obtained search warrant did not negate defendant's consent to search).

The case on which defendant relies, *State v. Brochu*, 237 A.2d 418 (Me. 1967), does not hold otherwise. There, police arrived at a home with a search warrant and obtained permission to enter and search. The court reasoned that, because the occupant of the home had no choice but to acquiesce, her consent had no independent significance. *Id.* at 422. Here, defendant gave his consent freely, before the warrant issued. That the police decided to cover all bases, so to speak, by also obtaining a search warrant does not affect the validity of defendant's consent.

Defendant also relies on *Brochu* for the proposition that his consent expired once he became a suspect in his wife's death. Again, the facts of *Brochu* are not analogous to the facts of this case. In *Brochu*, police searched the defendant's home with his consent as part of the investigation of his wife's death. A few hours later, based on new evidence, the police arrested the defendant for the murder. The court held that the defendant's consent did not extend to a subsequent search the next day, after defendant was arrested. *Id.* at 421. In this case, defendant was neither arrested nor charged at the time of the contested searches. See *State v. Koucoules*, 343 A.2d 860, 871 (Me. 1974) (supervening factor of arrest controlled decision in *Brochu*, not mere lapse of time between permission and actions of police). The fact that he may have been under suspicion, standing alone, did not change defendant's status enough to undercut his consent. See *id.* at 871 (noting that defendant's ostensible role as wife assisting in solution of husband's death had not changed from time she gave permission for initial search to time of subsequent search). Indeed, it is likely that defendant was under suspicion even at the time he gave his consent.

■ We conclude that under these circumstances, the police did not exceed the scope of defendant's consent by continuing their search on two subsequent days. Defendant left Vermont the same day he signed the consent form, without revoking his consent. He did not indicate, by word or action, that his consent expired at the end of that day, or was in some other way restricted. See *Connolly*, 133 Vt. at 570, 350 A.2d at 368 (where police obtained permission to search house to look for person, looking in refrigerator exceeded scope of consent); cf. *People v. Jackson*, 373 N.E.2d 729, 732 (Ill. App. Ct. 1978) (program counselor's consent to search of defendant's room clearly restricted to single search when she afterwards locked door and retained key); *State v. Jones*, 591 P.2d 796, 799 (Wash. Ct. App. 1979) (invitation to examine television set not consent to later search of entire apart-

ment). Finally, we note that the searches were close together in time, and part of a continuous criminal investigation into Christine Grega's death. On these facts, the police entry and search of the condominium on three consecutive days was within the scope of defendant's consent. See *Ferguson v. Caldwell*, 213 S.E.2d 855, 859 (Ga. 1975) (consent to search applied to second search that was conducted for same purpose within brief, reasonable period of time, where there was no evidence that defendant ever withdrew or limited consent).

## IV.

We now turn to defendant's claim that the trial court improperly excluded evidence that, according to defendant, supported his theory that another person murdered his wife. At trial, defendant tried to show that two other men, Bryant Comi and Michael Carpenter, may have been responsible for raping and murdering his wife. The two men were working as painters in the condominium complex on the day of the murder. Both were incarcerated for other offenses at the time of the trial.

As both Comi and Carpenter were called as witnesses at trial, along with Carpenter's wife, some evidence about the two men and their activities on the day of the murder did come before the jury. Carpenter first stated that he currently resided at the state correctional facility in St. Alban's. He then explained that he had been working at the condominium complex with Comi the day of the murder. He admitted that he had given police an incorrect address when he was interviewed the day after the murder. He also admitted that he may have been smoking Marlboro cigarettes the day of the murder. He denied murdering or raping the victim. Carpenter's wife, Daisy Carpenter, testified that Carpenter came home late on the evening of September 12, around 8:00 or 8:30 pm. This contradicted Carpenter's testimony that he arrived home no later than 7:30 pm.

Comi also testified that he currently resided in a correctional facility. He admitted that he made up an address that he gave police when he was questioned. He denied sexually assaulting or killing the victim, and specifically denied telling a former girlfriend that he and Carpenter had broken into a woman's home and choked her. He admitted, however, that he may have joked about sexually assaulting a woman in the condominium unit. He further admitted that he might have joked with Carpenter about killing a woman, in his girlfriend's presence. His testimony on this point was inconsistent, however; he later stated that he never said that he had killed a woman. Comi

denied smoking Marlboro cigarettes but admitted that, at the time in question, he typically bought Marlboros for his girlfriend.

Defendant argues, however, that he was unable to fully pursue his theory because the trial court excluded other evidence that would have pointed to Comi and Carpenter as the perpetrators. These evidentiary issues were largely resolved by the court prior to trial, when it granted the State's motion to exclude certain evidence relating to Comi and Carpenter's alleged sexual practices and claimed history of assaults, threatening behavior, and theft. Defendant argues that this ruling, together with the court's subsequent exclusion of the two men's criminal records, exclusion of a hearsay statement by Comi in which he allegedly claimed responsibility for the crime, and refusal to grant immunity to a defense witness, denied defendant the right to present a defense.

Defendant is correct that as part of his defense he is permitted to introduce evidence implicating others in the crimes for which he is accused. Such evidence, however, must conform to the rules of evidence, and may be excluded when the danger of unfair prejudice or confusion substantially outweighs its probative value. See *State v. Gilman*, 158 Vt. 210, 214, 608 A.2d 660, 663 (1992) (defendant entitled to call witnesses and present evidence on his behalf, but evidence must be otherwise admissible); see also V.R.E. 403 (relevant evidence may be excluded if probative value substantially outweighed by danger of unfair prejudice). We have previously stated the test for relevance of such evidence: "evidence tending to show a third party's involvement in a crime should be admitted 'as long as motive and opportunity have been shown and . . . there is also some evidence to directly connect [the] third person to the crime charged.'" *Gilman*, 158 Vt. at 214, 608 A.2d at 663 (quoting *State v. Denny*, 357 N.W.2d 12, 17 (Wis. Ct. App. 1984)); see generally D. McCord, *"But Perry Mason Made It Look So Easy!": The Admissibility of Evidence Offered By a Criminal Defendant to Suggest That Someone Else Is Guilty*, 63 Tenn. L. Rev. 917 (1996) (discussing "direct connection" standard for alleged alternative-perpetrator evidence).

We first note that some of the evidence that defendant claimed would "directly connect" Comi and Carpenter to the crime was rejected by the court because the actual evidence did not support the allegations made by defense counsel. Defendant claimed that one of Comi's girlfriends would testify that Comi repeatedly attempted to force her to have anal sex, and threatened to kill her if she did not comply with his demands. In fact, in her deposition the woman

recounted one request by Comi for anal intercourse, unaccompanied by violence, force or compulsion. She acknowledged that Comi had threatened to kill her, but stated that those threats were based on the possibility of her cheating on him or leaving him. Defendant claimed that another girlfriend of Comi's would confirm his propensity for anal intercourse. Defendant could provide no evidence to support this claim, however, because the woman denied that she and Comi engaged in anal intercourse.

Moreover, although defendant claims that the trial court "quashed" his right to present a defense, in fact much of the evidence he sought to present was simply inadmissible. For example, several statements that the defense sought to introduce were properly excluded by the court as inadmissible hearsay. The first is Bryant Comi's alleged statement to his girlfriend that he and Carpenter broke into a woman's house near Mt. Snow and strangled her. Defendant was permitted to ask Comi about this statement. The court, however, properly excluded testimony on the issue from Comi's girlfriend's social worker as hearsay not within any exception. See V.R.E. 804. The same is true of Comi's alleged statement to a State investigator that he may have joked about the killing. The statements do not fall under V.R.E. 804(b)(3), the exception for statements against interest, because Comi was available as a witness and, indeed, testified at trial. Moreover, defendant did not show that "corroborating circumstances clearly indicate[d] the trustworthiness of the statement," as required by Rule 804(b)(3).

█ Defendant similarly sought to introduce, through the testimony of one of Comi's former girlfriends, alleged statements by Comi in which he discussed his involvement in two other murders. Defendant also offered testimony from Daisy Carpenter relating a comment in which Comi bragged about his girlfriend walking like "she has a corn cob up her ass," presumably a reference to anal sexual intercourse. Again, both of these statements were hearsay not falling within any exception, and were properly excluded by the court.

Much of the evidence defendant sought to introduce about Comi and Carpenter was of the sort generally labelled "propensity evidence" — that is, evidence offered to show that because Comi and Carpenter had a history of violent and criminal activity, they were probably involved in Mrs. Grega's murder. Such evidence is barred by V.R.E. 404(a), which states that "[e]vidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion." The

rule further provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith." V.R.E. 404(b).

■ Defendant argues that the proffered evidence is admissible, however, because it tends to prove identity. See V.R.E. 404(b) (propensity evidence may be admissible for other purposes, including proof of identity). Specifically, defendant argues that Comi's inclination for anal intercourse and his history of violent behavior are together so distinctive as to constitute Comi's criminal signature. See *State v. Bruyette*, 158 Vt. 21, 29-30, 604 A.2d 1270, 1273-74 (1992) (in prosecution for sexual assault, evidence that defendant engaged in same distinctive sexual conduct with his girlfriend that he forced upon victim admissible to show identity). Defendant's proffer was quite different from the substantial, detailed evidence of specific sexual acts, words and phrases, role-playing, bondage, illegal drug use during sex, and sexual fantasies of the defendant that was admitted in *Bruyette*. See *id.* at 25, 604 A.2d at 1271-72. At best, defendant could show (1) that Comi occasionally engaged in or sought to engage in anal intercourse; and (2) that on a prior occasion, Comi had grabbed his girlfriend by the windpipe and squeezed hard enough to cut off her air and leave finger marks on her throat. The latter incident did not occur in the context of sexual activity. This evidence is not nearly strong enough or distinctive enough to show that forced anal intercourse with an object accompanied by choking constituted Comi's "signature." *Id.* at 27, 604 A.2d at 1272-73 (when prior-act evidence is offered to show identity, test for relevance is demanding; pattern and characteristics of prior acts must be so distinctive as to constitute defendant's signature).

Defendant further claims that the court's exclusion of character evidence about Comi and Carpenter violated his rights under the Sixth Amendment to the United States Constitution and Article 10 of the Vermont Constitution. One commentator has argued that strict application of Rule 404 and other rules of evidence may impair the right of a defendant to present a defense, and suggested that courts should give defendants some leeway in presenting, for example, propensity evidence that may point to another person as the perpetrator of the crime. See McCord, *supra*, 63 Tenn. L. Rev. at 977-79, 985-86. Assuming exclusion of evidence that is inadmissible under the Rules of Evidence could in some circumstances impair a defendant's right to present a defense, that did not happen here. Much of the evidence that defendant sought to introduce was weak, and often

entirely unrelated to the facts of Mrs. Grega's death. Such is the case, for example, with evidence that allegedly showed that Comi and Carpenter had a tendency to steal. Defendant sought to introduce testimony from a supervisor at the condominium development about a pair of hiking boots that had disappeared from a unit that was being painted. The supervisor mentioned this to Comi, and told him to let the crew know that if the boots reappeared, the incident would be forgotten. The boots did reappear a few hours later. There was no direct evidence that either Comi or Carpenter actually stole the boots. Moreover, nothing was stolen from the Gregas' condominium, so there is no reason why evidence tending to show that the two men were thieves would be relevant.

Defendant paints a picture of a compelling defense pointing to Comi and Carpenter as the actual perpetrators, and faults the court for excluding persuasive evidence that would have created a reasonable doubt as to his guilt. In fact, as the court recognized, much of this story falls apart when defendant's concrete evidence is examined. Defendant established no direct link between the two men and the crime of which he was accused. Instead, as the court noted, he merely gathered together "a number of remote acts, unsubstantiated statements, and unconnected activities or proclivities" in an unsuccessful attempt to implicate Comi and Carpenter. We conclude that the court did not abuse its discretion in granting the State's motion in limine and excluding the evidence discussed above.

■ Defendant's other evidentiary claims are also without merit. Defendant has not shown that the court abused its discretion in barring his use of Comi and Carpenter's criminal records as impeachment evidence.[1] See V.R.E. 609(a)(2) (witness may be impeached with evidence of felony conviction, where court determines that probative value substantially outweighs prejudicial effect). During his cross-examination, defense counsel attempted to impeach Carpenter with his criminal record. The court correctly sustained the State's objection, because defense counsel had not given notice of his intent to do so. See V.R.Cr.P. 26(c) (at least seven days before trial, party intending to offer evidence of criminal offenses to impeach witness must furnish to other parties written statement of acts or offenses it

---

[1] Defendant claims that he sought to introduce the convictions not only to impeach Comi and Carpenter, but also as support for the defense theory that Comi and Carpenter murdered the victim. As we have already discussed, however, such propensity evidence is barred by V.R.E. 404(a).

intends to offer); cf. *State v. Edwards*, 153 Vt. 649, 649, 569 A.2d 1075, 1076 (1989) (in appropriate circumstances, exclusion of witnesses as discovery sanction does not offend defendant's Sixth Amendment rights). Defense counsel then filed late notice of his intent to use prior convictions to impeach Comi. The court acted within its discretion in barring the use of this evidence, on the grounds that (1) the probative value of Comi's theft, burglary, and battery convictions did not substantially outweigh their prejudicial effect, see V.R.E. 609(a)(2), and (2) defense counsel's failure to comply with the notice requirements of V.R.Cr.P. 26(c) required exclusion of Comi's forgery convictions.

■ Finally, defendant argues that the court should have granted immunity to a prospective defense witness, a girlfriend of Comi's. He maintains that the court had inherent judicial authority to grant immunity to protect his right to present exculpatory evidence. Cf. *State v. Hamlin*, 146 Vt. 97, 108, 499 A.2d 45, 53 (1985) (declining to consider whether court has authority to grant immunity to defense witness in certain circumstances). Leaving this issue aside, we agree with the State that the immunity question is not properly raised in this case. As defense counsel did not call the witness, she did not invoke her right against self-incrimination on the stand, in response to specific questions. See *State v. Couture*, 146 Vt. 268, 275, 502 A.2d 846, 851 (1985) (witness may only assert privilege against self-incrimination regarding specific incriminating answers). The trial court thus did not have the opportunity to determine the scope of the privilege on a question-by-question basis. See *id.* at 275-76, 502 A.2d at 851 (court should exercise discretion in limiting assertion of privilege to questions raising a real danger of injurious disclosure; reversal of conviction not required where court did not have opportunity to "understandingly pass" on immunity question).

## V.

Having rejected defendant's procedural arguments, we now turn to his substantive claim: that the evidence presented at trial was insufficient to support his conviction. He argues that the trial court erred by denying his motion for judgment of acquittal pursuant to V.R.Cr.P. 29. Relying on our decision in *State v. Durenleau*, 163 Vt. 8, 652 A.2d 981 (1994), defendant maintains that the evidence presented by the State must be deemed insufficient, because it amounted to nothing more than suspicion and conjecture.

In reviewing a denial of a motion for acquittal, we look at the evidence presented by the State, viewing it in the light most favorable to the prosecution and excluding any modifying evidence, and determine whether that evidence sufficiently and fairly supports a finding of guilt beyond a reasonable doubt. See *id.* at 10, 652 A.2d at 982. As we explained in *Durenleau*, "The evidence must be examined both for its quality and strength; evidence 'that gives "rise to mere suspicion of guilt, or [leaves] guilt uncertain or dependent upon conjecture" is insufficient.'" *Id.* (quoting *State v. Robar*, 157 Vt. 387, 391, 601 A.2d 1376, 1378 (1991) (quoting *State v. Partlow*, 143 Vt. 33, 37, 460 A.2d 454, 456 (1983))).

Defendant attacks the State's case against him, arguing that each piece of circumstantial evidence may be explained in a way that does not link defendant to the murder. We agree with the State, however, that the evidence presented must be considered together, not separately. See *State v. Benneig*, 146 Vt. 391, 395, 505 A.2d 1192, 1195 (1985) (bits of circumstantial evidence of marijuana use by defendant, considered together, serve as evidence that she had power and intent to control marijuana found in her home). For our purposes here, we do not repeat each item of evidence, but recount only the most critical facts.

We begin by noting that the State presented evidence of both motive and opportunity. Defendant and his wife were having marital problems that were at least in part related to his drinking. Defendant admitted he had been drinking that day; moreover, the police found beer cans, some empty and some full, in the trash. The Gregas' suitcases were neatly and tightly packed. From this evidence, the jury could infer that the Gregas had fought over defendant's drinking and that Mrs. Grega was planning to leave. Defendant's own statements established that he was present at the condominium that evening.

Further, the physical evidence at the scene implicated defendant as the guilty party. Two facts in particular stand out: (1) the clothes in the washing machine, and (2) the unusual cleanliness of the crime scene. These facts indicate that the person who raped and murdered Mrs. Grega took time to clean and wipe down surfaces in the condominium, and to place the bloody clothes in the washing machine, let the machine fill up, and stop the machine mid-cycle so the clothing would soak in the soapy water. Only defendant would have been free to take his time cleaning up the scene, secure in the knowledge that no one else would be returning to the condominium. Defendant's

isolated fingerprint on the washing machine was also evidence that he had placed the bloody clothes in the washer.

Defendant's own statements to the police were also strong evidence against him. Although he claimed that he took his son to a local playground, he was not seen by other people at the playground, including one person who had a habit of looking for out-of-state plates. His claim that he returned to the condominium around 7:00 pm, or at dusk, leaves unexplained a substantial period of time between his return and the call to police at 8:30.

Perhaps most damaging to defendant was his attempt to explain his wife's death as an accident. He tried to provide innocent explanations for the injuries to her head and throat, and claimed that the unusual size of his penis might have caused her to bleed following anal intercourse. In fact, as the forensic evidence showed, the victim's injuries were much too serious to have been caused accidently, or during consensual intercourse. Defendant presumably recognized this at trial, when he sought to shift blame to Comi and Carpenter, and abandoned the theory that his wife's death was accidental. The jury could infer, however, that defendant gave police explanations for his wife's injuries because he was trying to cover up the murder as an accident. See *Durenleau*, 163 Vt. at 12, 652 A.2d at 983 (in assessing circumstantial evidence, fact-finder may draw rational inference to determine whether disputed ultimate facts occurred).

Finally, despite defendant's claims to the contrary, the evidence was not consistent with the defense theory that Mrs. Grega was killed by a stranger who broke into the condominium. There was no sign of forced entry or of a struggle. Assuming that such a person would have taken the time to clean up the crime scene, defendant cannot explain why the person would have washed defendant's clothes as well as the victim's, or why a bloody sanitary pad was thrown away together with cans of beer from the condominium. Defendant also points to the piece of cardboard from a carton of Marlboro cigarettes found in the toilet at the condominium. He emphasizes that both Comi and Carpenter had access to Marlboro cigarettes, while neither of the Gregas smoked. The evidence showed, however, that the piece of cardboard was closely adhered to the side of the toilet, and not part of the wad of towels clogging the toilet. The jury could have reasonably concluded that the cigarette package was disposed of long before the paper towels, and was in no way related to the Gregas or to the murder.

■ Taken together, the State's evidence clearly identified defendant as the man responsible for his wife's death. Looking at the evidence in the light most favorable to the State, we conclude that it was sufficient to support a finding of guilt beyond a reasonable doubt. The trial court did not err in denying defendant's motion for judgment of acquittal.

## VI.

Finally, defendant argues that the trial court erred when it denied his motion to preclude the imposition of sentence for his conviction of aggravated sexual assault because aggravated sexual assault is a lesser-included offense of aggravated murder. The court subsequently sentenced defendant to a term of fifty years to life for the aggravated sexual assault conviction, and ordered the sentence to run concurrently with his sentence for aggravated murder. Defendant now contends that his conviction and sentence for aggravated sexual assault is impermissible under the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution.

The Double Jeopardy Clause provides that no person may "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. This provision is made applicable to the states through the Fourteenth Amendment. See *Benton v. Maryland*, 395 U.S. 784, 795 (1969). The guarantee against double jeopardy prevents a second or subsequent prosecution for the same offense after either conviction or acquittal, as well as the imposition of multiple punishments for the same offense. See *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969).

When a defendant is tried in a single trial for two statutory offenses that criminalize the same conduct, whether or not a conviction and sentence may be had under each statute is a question of legislative intent, not constitutional prohibition. See *Missouri v. Hunter*, 459 U.S. 359, 367 (1983). The Legislature is free to impose multiple punishments, but its intent to do so must be clear. When it is not, the United States Supreme Court has applied a rule of statutory construction, first enunciated in *Blockburger v. United States*, 284 U.S. 299, 304 (1932), to divine whether the legislature intended to punish two separate offenses or one. Under the *Blockburger* test, the double jeopardy clause does not prevent multiple punishment if "each provision requires proof of a fact which the other does not." *Id.* at 304.

The State in the instant case charged defendant with aggravated murder pursuant to 13 V.S.A. § 2311(a)(8), alleging as the aggravating factor that the murder was committed while defendant was perpetrating a sexual assault.[2] To obtain a conviction, the State was required to prove each of the elements of both crimes beyond a reasonable doubt. See *id.* § 2311(b). The State also charged defendant with aggravated sexual assault pusuant to 13 V.S.A. § 3253(a)(1),

---

[2]The aggravated murder statute provides that:

(a) A person is guilty of aggravated murder if he or she commits a first or second degree murder, as defined in section 2301 of this title, and at the time of his or her actions, one or more of the following circumstances was in fact present:

(1) The murder was committed while the defendant was in custody under sentence for murder or aggravated murder.

(2) The defendant had, prior to commencement of the trial for aggravated murder, been convicted of another aggravated murder or murder in any jurisdiction in the United States and territories.

(3) At the time of the murder, the defendant also committed another murder.

(4) At the time of the murder, the defendant knowingly created a great risk of death to another person or persons.

(5) The murder was committed for the purpose of avoiding or preventing lawful arrest by a law enforcement officer of any person, or effecting an escape by any person from lawful custody of a law enforcement officer.

(6) The murder was committed by a person hired for such purpose in return for anything of value. Both the person hired and the person hiring him or her are guilty of aggravated murder.

(7) The victim of the murder was known by the person to be a person employed in any capacity in or about a correctional facility or a law enforcement officer, and was performing his or her official duties.

(8) The murder was committed in perpetrating or attempting to perpetrate sexual assault or aggravated sexual assault.

(b) In a prosecution for aggravated murder, the state shall allege and prove beyond a reasonable doubt one or more of the circumstances enumerated in subsection (a) of this section.

(c) The punishment for aggravated murder shall be imprisonment for life and for no lesser term. The court shall not place on probation or suspend or defer the sentence of any person convicted of aggravated murder. A person sentenced under this section shall not be eligible for parole during the term of imprisonment imposed herein and shall not be eligible for work-release or noncustodial furlough except when serious medical services make custodial furlough inappropriate.

13 V.S.A. § 2311.

alleging as the aggravating factor that defendant inflicted serious bodily injury during the perpetration of a sexual assault. Defendant was convicted of both aggravated murder and aggravated sexual assault. He argues, however, that serious bodily injury is always proved by proof of death. Defendant contends, therefore, that aggravated sexual assault is a lesser-included offense of aggravated murder because the lesser offense required no proof beyond that required of the greater offense. The State argues, however, that aggravated murder is not the same offense as aggravated sexual assault under the *Blockburger* test, because the crimes require proof of different facts. Aggravated murder requires proof of death; aggravated sexual assault requires proof of serious bodily injury.

The aggravated sexual assault statute defines serious bodily injury as "bodily injury which creates a substantial risk of death or which causes substantial loss or impairment of the function of any bodily member or organ, or substantial impairment of health, or substantial disfigurement." *Id.* § 3251(4). We agree that, under this definition, proof of death will always include proof of serious bodily injury. Nor are we persuaded by the State's argument that the offenses are distinct because there was evidence at trial supporting a finding of serious bodily injury that was separate from the evidence of the victim's death. The *Blockburger* test focuses on the statutory elements of the offenses; the evidence and proof offered at trial are immaterial to the analysis. See *Grady v. Corbin*, 495 U.S. 508, 521 n.12 (1990), *overruled on other grounds, United States v. Dixon*, 509 U.S. 688, 705 (1993). Proof of the elements of aggravated murder under § 2311(a)(8) necessarily proves every element of aggravated sexual assault as it is defined under § 3253(a)(1). Aggravated sexual assault under § 3253(a)(1) is a lesser-included offense of aggravated murder under § 2311(a)(8). See *State v. Savva*, 159 Vt. 75, 93, 616 A.2d 774, 784 (1992) ("'An offense is a lesser-included offense of another if it is composed of some, but not all, elements of the greater offense and does not have any element not included in the greater offense.'" (quoting *State v. Forbes*, 147 Vt. 612, 616-17, 523 A.2d 1232, 1235 (1987))); see also *State v. Bourn*, 139 Vt. 14, 16, 421 A.2d 1281, 1282 (1980) ("The lesser offense is included in the greater only if each of its elements 'is always a necessary element of' the greater offense." (quoting *Illinois v. Vitale*, 447 U.S. 410, 419 (1980))). Because the two provisions set forth the "same" offense under the *Blockburger* test, we must presume that the Legislature did not intend for the imposition of cumulative punishment for aggravated murder and

aggravated sexual assault as they are charged in the instant case.[3] See *Whalen v. United States*, 445 U.S. 684, 694-95 (1980) (Double Jeopardy Clause offended if defendant is separately sentenced for felony murder and for rape, where rape was predicate crime required to be proved as element of felony murder).

The *Blockburger* presumption may be overcome, however, by a "clear indication of contrary legislative intent." *Albernaz v. United States*, 450 U.S. 333, 340 (1981). Thus, when the legislature has specifically authorized cumulative punishment for the same act, the *Blockburger* presumption must yield, and the imposition of such punishment does not violate double jeopardy. See *Garrett v. United States*, 471 U.S. 773, 778-79 (1985); accord *Hunter*, 459 U.S. at 368. The Legislature did not, however, include a provision in the aggravated murder statute expressly resolving whether it intended courts to impose multiple punishment for aggravated murder and its applicable predicate offenses. Moreover, we cannot conclude from the language, structure, or legislative history of the statutes that the Legislature intended to authorize separate punishment under each.

We turn first to the statutory scheme defining murder and aggravated murder and the penalties for homicide, which was comprehensively amended by the Legislature in 1987. See *State v. Ashley*, 161 Vt. 65, 67, 632 A.2d 1368, 1370 (1993) (when interpreting criminal statutes, "[w]e will read operative sections of [the] statutory scheme in context and the entire scheme in pari materia."). The crimes of first- and second-degree murder are defined by 13 V.S.A. § 2301, and the sentence for a crime under § 2301 is set forth in § 2303. A new crime, the crime of aggravated murder, was added in § 2311. The language of both the penalty provision (§ 2303) and the aggravated murder statute (§ 2311) is modeled after the Model Penal Code's death penalty provision. See American Law Institute, Model Penal Code § 210.6 (1980).

Section 2303 enumerates various aggravating and mitigating factors that courts should consider when imposing sentences for first-

---

[3] The Legislature has defined the crime of aggravated murder as first- or second-degree murder under any one of the eight enumerated circumstances. See 13 V.S.A. § 2311(a)(1)-(8). Thus, aggravated murder does not in all cases require proof of sexual assault or aggravated sexual assault because there are seven other aggravating circumstances. Where aggravated murder is based on an aggravating circumstance other than sexual assault, cumulative punishment for aggravated sexual assault and aggravated murder is permissible under the *Blockburger* analysis. Aggravated murder would require proof of the victim's death, but not proof of a sexual act. Aggravated sexual assault requires proof of a sexual act, but not proof of the victim's death. Thus, each offense would require proof of a fact that the other does not.

and second-degree murder. See 13 V.S.A. § 2303(d), (e). The statute provides for penalties ranging from life in prison with a minimum term of ten years, to life in prison without the possibility of parole. The Legislature also incorporated the Model Penal Code's provision for a bifurcated trial by separating the penalty phase from the merits phase of a first- or second-degree murder proceeding. See *id.* § 2303; M.P.C. § 210.6. Under this provision, the trial court considers the aggravating and mitigating factors at a separate sentencing hearing, rather than at trial. See 13 V.S.A. § 2303(c). Thus, the aggravating factor is not proved as an element of the underlying offense in the merits phase of the prosecution.

When the statute is structured in this manner, there is no violation of double jeopardy. Criminal conduct can be used to enhance a sentence at a sentencing hearing regardless of whether the defendant has been charged with, convicted of, or even acquitted of the conduct, as long as it has been proven at the hearing by a preponderance of the evidence. See *United States v. Watts*, 519 U.S. 148, 157 (1997) (court may consider conduct for which defendant has been acquitted provided that conduct is proven by preponderance of evidence); accord *State v. Rock*, No. 96-478, slip op. at 2 (Vt. Feb. 5, 1998); *State v. Pellerin*, 164 Vt. 376, 383, 670 A.2d 255, 259 (1995) (trial court at sentencing hearing may consider prior convictions of defendant); *State v. Drake*, 150 Vt. 235, 236, 552 A.2d 780, 781 (1988) (court may consider prior crimes for which defendant was not tried). The Double Jeopardy Clause is not offended as long as the sentence is within the range authorized by the Legislature because the resulting sentence is considered punishment only for the offense of conviction. See *Witte v. United States*, 515 U.S. 389, 403-04 (1995).

In contrast, the Legislature did not follow the Model Penal Code with respect to the penalty provisions for aggravated murder. Unlike the statutory scheme for first- and second-degree murder, the Legislature did not bifurcate the merits and penalty phase of an aggravated murder proceeding. See 13 V.S.A. § 2311(c). Rather, the Legislature required the State to prove the aggravating factor beyond a reasonable doubt, as an element of the offense of aggravated murder. The statute is not unlike that for the crime of felony murder considered in *Whalen*, 445 U.S. at 693-94, in which the United States Supreme Court held, consistent with the *Blockburger* analysis, that when proof of rape is a necessary element of proof of felony murder, rape is a lesser-included offense for purposes of the Double Jeopardy Clause and may not receive a separate sentence.

We recognize that the offenses at issue in this case are not lesser-included offenses in the traditional sense. See *Whalen*, 445 U.S. at 708 (Rehnquist, J., dissenting) ("[T]he *Blockburger* test, although useful in identifying statutes that define greater and lesser included offenses in the traditional sense, is less satisfactory, and perhaps even misdirected, when applied to statutes defining 'compound' and 'predicate' offenses."). Traditionally, greater and lesser-included offenses reflect a "'continuum of culpability'" in which each offense along the continuum "'serve[s] to vindicate the same social norm.'" *People v. Harding*, 506 N.W.2d 482, 492 (Mich. 1993) (quoting *People v. Wilder*, 308 N.W.2d 112, 125 (Mich. 1981)). For example, first-degree murder and murder in lesser degrees are themselves lesser-included offenses of aggravated murder because each of these offenses serves to vindicate the commission of a homicide. The offenses along the continuum are logically related. See *id.* The progression along this continuum reflects increasingly culpable acts of homicide warranting increasingly severe punishment. This relationship does not exist between the compound and predicate crimes in this case. Rather than being related by logic, these offenses are related only by the decision of the Legislature. See *id.* Nevertheless, "we are unpersuaded that this case should be treated differently from other cases in which one criminal offense requires proof of every element of another offense." *Whalen*, 445 U.S. at 694.[4]

In view of the manner in which the Legislature has constructed the aggravated murder statute, we cannot find any evidence that the Legislature intended to permit separate penalties for aggravated murder and aggravated sexual assault in the circumstances presented by this case. In the absence of clear legislative intent, courts are restrained from guessing whether the Legislature would impose two sentences. See *id.* at 695. Moreover, settled law requires that "'ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity.'" *United States v. Bass*, 404 U.S. 336, 347 (1971)

---

[4] In *Whalen*, the Supreme Court held that dual convictions for rape and felony murder predicated on the rape violated double jeopardy. See *Whalen v. United States*, 445 U.S. 684, 694-95 (1980). The felony-murder statute at issue listed several predicate felonies other than rape. If the Court had applied the *Blockburger* test to the entire felony-murder statute, it would have concluded that rape and felony murder were separate offenses. Rape did not require proof of a killing, and felony murder did not require proof of rape — any of the other predicate felonies was sufficient. The Court instead applied the *Blockburger* test to the felony-murder statute after incorporating the predicate felony as a required element of proof. See *id.* at 695. The Court then concluded that rape was a lesser-included offense. This result obtained notwithstanding the fact that the criminal statutes were aimed at separate social evils.

(quoting *Rewis v. United States*, 401 U.S. 808, 812 (1971)). "'This policy of lenity means that the Court will not interpret a . . . criminal statute so as to increase the penalty that it places on an individual when such an interpretation can be based on no more than a guess as to what [the Legislature] intended.'" *Whalen*, 445 U.S. at 695 n.10 (quoting *Ladner v. United States*, 358 U.S. 169, 178 (1958)).

▪ Our conclusion is buttressed by the character of the penalty imposed. A conviction for aggravated murder carries with it the maximum sentence permitted under Vermont law, and the sentence is mandatory. A defendant convicted of this crime is not eligible for probation, parole, work release, or noncustodial furlough "except when serious medical services make custodial furlough inappropriate." 13 V.S.A. § 2311(c). Considering the severity of this sentence, where aggravated murder and aggravated sexual assault criminalize the same conduct, as it does in this case, we conclude that the Legislature intended to consolidate the punishment for murder and aggravated sexual assault into one sentence for aggravated murder. Accordingly, defendant's sentence for aggravated sexual assault is impermissible under the Double Jeopardy Clause.

## VII.

In conclusion, we must address defendant's claim that the trial judge failed to exhibit an impartial and unbiased judicial demeanor. We have examined the transcripts of this trial, and have found no support for defendant's claims that Judge DiMauro was "extremely sensitive" to the cross-examination of law enforcement officers and hostile to defendant's theory of the case. Nor are we impressed with defense counsel's unfounded speculation that the judge's marital relationship with a law enforcement officer affected her conduct of this trial. See *State v. Putnam*, 164 Vt. 558, 564-65, 675 A.2d 422, 426 (1996) (judge permitted to preside over criminal trial where officers from her husband's police barracks were involved in investigation and as trial witnesses).

▪ In short, defendant's trial was in all respects proper and fair. Indeed, defendant made no successful claim of error on appeal. Accordingly, defendant's claim that Judge DiMauro's role as presiding judge in this case requires reversal of his conviction has no basis.

*Affirmed, except defendant's sentence for aggravated sexual assault is vacated.*

■ On reargument, defendant contends that, under the Double Jeopardy Clause, we must vacate the conviction for aggravated sexual assault, not simply the sentence on the conviction. We agree that the conviction for aggravated sexual assault cannot stand. The United States Supreme Court rejected the contention that multiple convictions could stand to provide a backup conviction in the event that the conviction on the greater offense is reversed. See *Rutledge v. United States*, 517 U.S. 292, 305-06 (1996). Instead, the Court approved a procedure where courts have directed "entry of judgment for a lesser included offense when a conviction for a greater offense is reversed on grounds that affect only the greater offense." *Id.* at 306. In view of *Rutledge*, we vacate the conviction for aggravated sexual assault. See *United States v. Rosario*, 111 F.3d 293, 301 (2d Cir. 1997) (*Rutledge* disapproved previous practice in Second Circuit of entering concurrent convictions on lesser and greater offenses).

*Defendant's conviction for aggravated sexual assault is vacated.*