Grega v. Pallito, No. 587-11-10 Wmcv (Wesley, J., Sept. 2, 2011)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

**STATE OF VERMONT**
**SUPERIOR COURT**

| | |
|---|---|
| **JOHN C. GREGA**<br> Plaintiff<br><br> v.<br>**Andrew Pallito, Vermont Commissioner Of Corrections**<br> Defendant | **WINDHAM UNIT, CIVIL DIVISION**<br>**Docket No. 587-11-10 Wmcv** |

## OPINION & ORDER

Petitioner seeks relief pursuant to 13 V.S.A.§5566(a)(1) compelling the State to submit specimens maintained as evidence for further DNA testing. A bench trial was held on August 4, 2011. Petitioner was represented by Ian Carleton, Esq. The State was represented by Ass't Attorney General David Tartter, Esq.

At the trial, each party presented a single witness. Dr. Steven Laken, a forensic DNA expert, testified on behalf of Petitioner. Dr. Margaret Schwartz, senior forensic chemist at the Vermont Forensic Laboratory, testified on behalf of the State.

### Factual Background & Procedural History

Based on a jury verdict, John Grega was convicted on August 4, 1995 of murdering his wife while they were vacationing at a rented condominium near Mt. Snow. He was also convicted of aggravated sexual assault, which was subsequently reversed. He was sentenced to life without parole. His conviction for aggravated murder was upheld, *State v. Grega*, 168 Vt. 363 (1998), his petition for post-conviction relief based on ineffective assistance of counsel was denied and upheld on appeal, *In re Grega*, 2003 VT 77, and his federal petition for habeas corpus was denied, *In re Grega*, 2007 WL 2446781.

Christine Grega was found nude in the downstairs bathroom of the condominium. Her autopsy revealed blunt trauma injuries to her head, neck, trunk and extremities. There were also multiple lacerations in the anal/rectal region. The medical examiner concluded that the cause of death was asphyxia and classified the death as a homicide. A forensic pathologist testified that the anal injuries were caused by a foreign object about twice the size of a normal penis that was inserted in the victim's rectum with moderate to severe force. Grega gave several accounts of the events surrounding his wife's death, which included conflicting details. He told police the reason for his trip with his wife was to get their marriage "back on track", after they had discussed divorce. He stated that he had been away from the condominium with his young son, and returned to find his wife in the downstairs bathtub. After unsuccessfully trying to resuscitate her, he ran next door to have the neighbors call an ambulance. The police responded to an emergency call for

assistance for someone who had "fallen in a bathroom". After learning about the victim's anal injuries, he gave different versions of his recent sexual relations with his wife, at first stating that they had sex twice on the morning of her death, and later saying that they had vaginal sex in the morning and anal sex in the afternoon. At first he explained that he sometimes grasped his wife neck during sex, unless she complained that "it was too rough", and said that his wife's head injuries might have been caused by her hitting a wall or the bed during sex. Later, in the presence of his attorneys, he changed the timing of some of the events he had earlier described, and disclaimed having his hands around his wife's neck while having sex with her earlier in the day, further describing her condition as "fine" after sex with no complaints of being disabled or in pain.

Consistently throughout these legal proceedings, Petitioner has insisted that someone else committed the murder, focusing attention on two painters working in the vicinity, Bryant Comi and Michael Carpenter. Both men testified at Petitioner's trial and denied any involvement. The trial court excluded evidence of the criminal histories of these men; their alleged sexual practices, history of assaultive behavior and prior thefts; and a hearsay statement attributed to Comi in which he purportedly claimed responsibility for the crime. These rulings were sustained on appeal as proper applications of V.R.E.404(a), and the Supreme Court endorsed the trial court's characterization that, in an effort to implicate Comi and Carpenter, Petitioner had merely gathered together "a number of remote acts, unsubstantiated statements, and unconnected activities and proclivities". *State v Grega* at 378.

The Court also rejected Petitioner's argument that the circumstantial evidence was insufficient to support the conviction. The Court noted the presence of bloody clothes left at mid-cycle in a washing machine in the condominium, and the otherwise unusual cleanliness of the crime scene.

> These facts indicate that the person who raped and murdered Mrs. Grega took time to clean and wipe down surfaces in the condominium, and to place the bloody clothes in the washing machine, let the machine fill up, and stop the machine mid-cycle so the clothing would soak in the soapy water. Only defendant would have been free to take his time cleaning up the scene, secure in the knowledge that no one else would be returning to the condominium. Defendant's isolated fingerprint on the washing machine was also evidence that he had placed the bloody clothes in the washer.

*Id.* at 380. The Court also found that "most damaging to defendant was his attempt to explain his wife's death as an accident". It also construed the evidence as inconsistent with the theory that the perpetrator was a stranger, since there was no sign of forced entry, and there was no logical explanation for a stranger taking the time to clean and put the clothes in the wash. Regarding a piece of cardboard from a carton of Marlboro cigarettes found inside the toilet, when neither Gregas smoked and the two painters were known to favor Marlboros, the Court observed, "the piece of cardboard was closely adhered to the side of the toilet, and not part of the wad of towels clogging the toilet. The jury could have reasonably concluded that the cigarette package was disposed of long

2

before the paper towels, and was in no way related to the Gregas or to the murder." *Id.* at 381.

**Discussion**

Effective July 1, 2008, persons convicted of qualifying crimes are entitled to seek post-conviction DNA testing "of any evidence which may contain biological evidence that was obtained during the investigation or prosecution of the crime". 13 V.S.A.§ 5561(a). In the course of the proceedings created by the Innocence Protection Act, and following a hearing, the court shall grant the petition and order DNA testing upon making statutorily required findings, beginning with: "A reasonable probability exists that the petitioner would not have been convicted or would have received a lesser sentence for the crime for which the petitioner claims to be innocent of in the petition if the results of the requested DNA testing had been available to the trier of fact at the time of the original prosecution." 13 V.S.A.§ 5566(1).

By their pre-trial framing of the issues invoked by Petitioner's request for DNA testing in this case, the parties have stipulated to certain additional testing of evidence preserved from the investigation of the homicide for which Petitioner was convicted. By the Joint Specification of Factual and Legal Issues No Longer in Dispute, and Consolidated Trial Memorandum filed June 30, 2011, the parties agreed: 1) to narrow the list of samples in dispute to 32 from the 70 originally specified by the petition; and 2) that of the 32 samples, the State acknowledged the duty under the statute to submit five of them for further DNA testing. This evidence is identified generally as "swabs and/or fingernail scrapings taken from the victim's body", and more specifically as: i) A-16-1, vaginal swab taken from victim; ii) A16-2, oral swab taken from victim; iii) A16-3, anal swab taken from victim; iv) A1, right hand fingernail scraping from victim; and v) A2, left hand fingernail scraping from victim.

Ex. 1 admitted in evidence is titled Table of Disputed Samples, (attached as an addendum to this opinion), which lists other preserved specimens within the following categories: i) hair samples taken from various locations at the crimes scene, including 3 found in or on body bag, 3 found in trash, 7 found in washing machine, 3 found in other specified locations in apartment, and 3 whose location when retrieved is unclear; ii) bath and shower stains possibly containing biological material; iii) piece of Marlboro carton and paper towels clogging upstairs toilet; iv) item tested positive for phenolphthalein from base of upstairs toilet; v) items listed in 11/14/94 lab report indicating presence of blood or unidentified DNA, including cutting from gray shorts and two cuttings from pink towel.

Although each party presented expert opinion for the Court's consideration, the issue in dispute is only tangentially informed by such testimony. Petitioner's position, supported by Dr. Laken, is that the science of DNA profiling has significantly advanced since the investigation in 1994, that each of the 32 disputed samples has the possibility of including biological material from which a full or partial DNA profile might be reconstructed, and that the identification of a DNA profile associated with evidence

3

gathered from anywhere in the condominium, matching either Carpenter or Comi, or even an unknown male, would inescapably yield the conclusion that Petitioner probably would not have been convicted had such evidence been known to the jury.

The State disputes the logic of each aspect of this assertion. As a threshold matter, and in reliance of Dr. Schwartz's opinion, the State contests whether most, if not all, of the specimens are likely to yield identifiable DNA material. Many of the samples were gathered from places in the condominium where contact with water makes it likely that any biological material would be too degraded to permit DNA reconstruction; for example, cuttings from shorts and towels that were soaking in the washing machine, the cardboard from the cigarette carton and the towels plugging the toilet, and samples from stains on the bath and shower. According to Dr. Schwartz's credible testimony, the latter samples were tested for blood, which was negative at the time, and the methods to screen for blood have not changed significantly. Furthermore, even Dr. Laken acknowledged that problems associated with testing hair samples frequently result in no identifiable DNA, or at best a partial profile. Nor does he dispute Dr. Schwartz's observation that hair is easily transferred, thus the presence of hair from an unknown subject anywhere in the condominium has so many possible explanations that it can't reasonably be said to be probative of Petitioner's innocence.

While acknowledging that "an unknown male, DNA profile on a biological sample taken from within the victim's body" would raise sufficient doubts as to Petitioner's innocence, the State insists that, even if such a profile might arguably be developed from the other disputed specimens, the presence of such unknown male DNA would not likely change the outcome of the case, and therefore the Court is without authority to order testing even it might produce such an outcome. Except as to the 3 hair specimens found on the body bag, the Court agrees.

Dr. Schwartz credibly explained that the further from the body specimens were collected, the less likely they were to be tested in a typical crime scene investigation due to the probability that they would yield no useful information. Further, she stated that without other indications to support likely relevance, the testing of likely irrelevant material is wasteful, and potentially confusing, as it requires resources and time to be directed in what is most likely an unproductive fashion. On this score, she squarely disagreed with Dr. Laken, whose view as a forensic expert primarily engaged by the subjects of criminal investigations is fairly summarized, "if it is capable of being tested, it should be tested, because the more information, the better". As the State argues, however, this view supports a much broader scope of testing than the standard incorporated in the statute.

Nevertheless, on cross-examination Dr. Schwartz conceded that further testing of the hair samples found on the body bag was justified by the logic of the standard testing protocol which she espoused. While other explanations for the presence of the hair samples are possible that are consistent with Petitioner's guilt, including the deposit of one or all during the course of the investigation, on the current record the Court concludes that the possible explanations consistent with innocence might be strong

enough to possibly alter the outcome of the original verdict. However, as to the remaining samples, they are too remote from the immediate crime scene, and too unlikely to yield probative DNA evidence, to qualify as likely to result in evidence that would alter the outcome of Petitioner's convictions. There is a high degree of speculation associated with any assumption that there will be testable material on most of these specimens. Furthermore, even were the Court to speculate that testing of one or more of the specimens might result in a DNA profile of an unknown male, it is doubtful such evidence would even be admissible, much less likely to alter the outcome. Much like the Rule 404(a) evidence excluded by the trial court, unknown DNA unconnected by time of deposit, or from the immediate location in the downstairs bathroom where Christine Grega's was found, could only be used to generate unsupported speculation that a different perpetrator murdered her. [1]

Two other aspects of the expert testimony bear commenting upon. First, as further justification for the opinion that all disputed samples should be tested, Dr. Laken explained that it might be possible that one of the samples stipulated for testing would yield only a partial profile, but that such test results could become much more significant if matched with a fuller profile developed from another sample found elsewhere in the condominium. The Court rejects this rationale as relying on a ladder of speculation too flimsy at present to support the required finding for ordering testing. However, this ruling is made without prejudice to a renewed request for more expanded testing, if the results of any tests of those specimens covered by the stipulation and this order plausibly justify such a further request.

Second, although it is apparently conceded that Carpenter and Comi have likely been subject to DNA sampling as a result of their criminal histories, such that the DNA profile of each is included in the CODIS database, the State took the position in its pre-trial memorandum that the Court had no authority to order any particular comparison using CODIS. According to that argument, only samples taken from "putative perpetrators" are eligible for entry into CODIS, a determination made in the sole discretion of the Vermont Forensic Lab applying CODIS protocols. Nonetheless, Dr. Schwartz's testimony appears to have obviated any need to squarely address this asserted jurisdictional limitation. She acknowledged that if the Court concluded that testing was warranted, and if testing generated a DNA profile, it would be logical and expected that a CODIS comparison would result from such testing. Thus, the Court need not at this time make any specific order as to CODIS comparison, relying on the expectation that it would occur as explained by Dr. Schwartz. Should that expectation go unfulfilled, the extent of the Court's authority will doubtless be re-examined under the circumstances as they may exist upon further request for relief.

---

[1] Petitioner argues that if such unknown DNA matched Carpenter's of Comi's through a CODIS comparison, that result would have a dramatic impact in light of the testimony by each disclaiming any knowledge or involvement, as well as in further consideration of other inaccurate statements they gave to the police. While the Court doesn't disagree such evidence would meet the statutory test, *assuming* it was developed, Petitioner's basis for claiming any likelihood that it *will* develop is presently founded on the same unsupportable speculation that has been repeatedly rejected at each level of judicial review.

5

In sum, the Court concludes that, on the current record, Petitioner has failed to demonstrate that testing of any of the specimens listed in the Table of Disputed Samples would likely produce evidence that would alter the outcome of his conviction, except for the three hair samples found on the body bag. As this issue was the only one presented by the Joint Specification of Factual and Legal Issues and Consolidated Trial Memorandum, the Court makes no order as to the specifics of further DNA testing of those samples stipulated for such testing, as well as for those added for testing by this order. The Court assumes that these mechanics have been stipulated; if either party believes that they must be incorporated into a judicial order, the Court will expect a stipulated proposal to that effect.

WHEREFORE it is hereby ORDERED: The petition for DNA testing is GRANTED as to specimens A-16-1, A16-2, A16-3, A1, & A2, based on the parties' stipulation, and as to specimens A13-1, A13-2 & A14 based on the reasoning above. As to each of the other specimens listed in the Table of Disputed Samples, the petition for DNA testing is DENIED.

Dated at Newfane this            day of                        , 2011.


_____
John P. Wesley
Superior Court Judge

6