2015 VT 43

# State of Vermont v. Warren Breed

[117 A.3d 829]

No. 13-288

Present: **Reiber, C.J., Dooley, Skoglund and Robinson, JJ., and Hayes, Supr. J., Specially Assigned**

Opinion Filed March 13, 2015

*Christina Rainville*, Chief Deputy State's Attorney, Bennington, for Plaintiff-Appellee.

*Matthew F. Valerio*, Defender General, and *Joshua S. O'Hara*, Appellate Defender, Montpelier, for Defendant-Appellant.

¶ 1. **Hayes, Supr. J.,** Specially Assigned. Defendant appeals jury convictions for sexual assault and sexual assault of a vulnerable adult based on a single incident. He argues that the court erred by: (1) allowing a three-week separation period between jury selection and the commencement of his trial; (2) denying his motion to dismiss one of the convictions on double-jeopardy grounds; and (3) admitting the hearsay testimony of the complainant's brother under the excited-utterance exception. We vacate the sexual assault conviction on double-jeopardy grounds, but reject defendant's other arguments and affirm his conviction of sexual assault of a vulnerable adult, as well as the sentence imposed for that conviction.

## I. Facts and Procedural History

¶ 2. Defendant, who was in his seventies at the time of the incident that led to the charges against him, lived in the same residential facility for disabled adults and senior citizens as the complaining witness, a woman with intellectual disabilities. In February 2012, the State filed an information alleging that sometime in June 2007 defendant: (1) engaged in a sexual act with another person without her consent, in violation of 13 V.S.A. § 3252(a)(1); and (2) engaged in sexual activity with a vulnerable adult without her consent, in violation of 13 V.S.A. § 1379(b)(1). The charges were based on a single incident in which defendant lured the complainant into his apartment under false pretenses and then forced her to engage in a sexual act without her consent.

¶ 3. In October 2012, the trial court scheduled a final jury calendar call for January 2, 2013 and a jury draw for January 8, 2013. At the January 2 calendar call, the court set a trial date of January 29, 2013. The trial took place on January 29 and 30, and the jury convicted defendant on both charges. The court denied defendant's motion for judgment of acquittal on the charges as well as his motion for a new trial. The court ruled that the evidence was sufficient to sustain the convictions and rejected defendant's contention that the court had improperly admitted the hearsay testimony of the complainant's brother based on the excited utterance exception.

¶ 4. Following the convictions, but before sentencing, defendant moved to dismiss one of the convictions on double-jeopardy grounds. The trial court denied the motion, concluding that the Double Jeopardy Clause was not violated because the two offenses contained different elements and different punishments, indicating, along with the statutes' purpose sections, that the Legislature intended to permit punishment for both crimes based on a single incident. On July 18, 2013, the court imposed concurrent sentences of three years to life imprisonment for the sexual assault conviction and three-to-twenty years for the sexual assault of a vulnerable adult conviction.

## II. Jury Separation

¶ 5. Defendant first argues on appeal that his convictions should be reversed because the trial court allowed a three-week separation period between the jury selection and his trial and then did

not provide an opportunity for supplemental juror examination and challenges, in violation of Vermont Rule of Criminal Procedure 23(d). Because defendant did not object, and in fact acquiesced, to the procedure he now challenges for the first time on appeal, we review this claim under a plain-error analysis. See *State v. Yoh*, 2006 VT 49A, ¶ 36, 180 Vt. 317, 910 A.2d 853 ("When an issue has been forfeited through a party's failure to raise it below or brief it on appeal, we may consider it only under the rubric of plain error."). "Plain-error analysis requires us to consider whether these are exceptional circumstances where a failure to recognize error would result in a miscarriage of justice, or where there is glaring error so grave and serious that it strikes at the very heart of the defendant's constitutional rights." *Id.* ¶ 39 (quotation omitted). Thus, the error must be both obvious and prejudicial, such that it affects defendant's substantial rights and the fairness or integrity of the judicial proceedings. *Id.*

¶ 6. In its present form, Rule 23(d) provides, in relevant part, as follows:

> Unless the parties consent to a longer delay, trial must commence not more than 48 hours after jury selection in the case of a felony for which the penalty may be life imprisonment or death, and not more than 30 days after jury selection in any other case. If the commencement of trial is delayed more than 24 hours, the parties shall be entitled to conduct a supplemental examination of the jurors as provided in Rule 24(a) related solely to issues arising from the period of separation and may exercise challenges for cause as provided in Rule 24(b) before the jury is sworn.

This section of subdivision (d) was initially added "to govern jury separation and the timing of the trial after the jury is selected." Reporter's Notes — 1984 Amendment, V.R.Cr.P. 23. As first adopted, the rule did not allow the jury to separate in capital (life imprisonment) cases even if the parties agreed, and gave defendants in every felony case the right to a "pick and go" trial. *Id.* Rule 23(d) was later amended "to eliminate the absolute right to pick a jury and go to trial immediately in a felony case," a right that was causing serious problems of delay, especially in small counties that had one jury draw per month. Reporter's Notes — 1995 Amendment, V.R.Cr.P. 23. Rule 23(d) was again amended in

2008, this time "to permit up to thirty days to pass between jury selection and trial of felonies not punishable by life imprisonment." Reporter's Notes — 2008 Amendment, V.R.Cr.P. 23.

¶ 7. In this case, at a January 2, 2013 final calendar call, after the January 8, 2013 jury drawing had already been scheduled, the trial court announced to defense counsel and the prosecutor that a one-day jury trial would be scheduled for January 29, 2013. When the court asked if that date made sense, defense counsel responded in the affirmative and then asked if this case was first in line for trial on that date. When the court confirmed that it was, defense counsel responded: "Great, thank you." The jury was selected, as scheduled, on January 8. At the conclusion of jury selection, the court reminded the jurors as follows:

> Again, please do not discuss this case with anyone between now and [January 29]. Don't do any independent research.

> If for whatever reason there's something in the newspaper or something comes on the radio, turn the page or turn the dial on the radio so you don't hear anything about it. If something does happen, just report to us and we can deal with it.

At no time during the jury draw did defense counsel object to the three-week separation period that would occur between the time the jury was selected and the trial.

¶ 8. On January 29, 2013, on the first day of trial before evidence was presented, the trial court asked the jurors if any of them had "heard anything about the case or the parties or learned anything about it or done any independent research since" the January 8 jury selection. The court then stated for the record that all of the jurors responded in the negative. Defense counsel did not ask at that time to conduct a supplemental examination of the jurors concerning the separation period or to retain the option to exercise additional challenges for cause based on any such examination.

¶ 9. Now, for the first time on appeal, defendant argues that the court committed reversible error by not obtaining his consent to allow a separation period beyond forty-eight hours and then by not providing him with an opportunity to examine the jurors about the separation period and potentially to exercise additional chal-

lenges for cause. He presents no evidence of actual juror taint, or even of media coverage about the case during the separation period, but rather states that he need show only the existence of circumstances capable of prejudicing the deliberative function of the jury. He claims that prejudice exists here because the crime is serious enough, and the separation period long enough, for the jurors to be exposed to prejudicial information. According to defendant, that, coupled with what he characterizes as the trial court's weak admonitions, supports a reversal of the convictions here. He further contends that there is plain error because the court's procedure obviously did not comport with the procedures set forth in Rule 23(d), prejudicially impacted his substantial rights provided by the rule, and seriously affected the fairness and integrity of his trial. We disagree, and conclude that there is no plain error here.

¶ 10. ■ ■ We first consider whether there is error, and if so, whether that error was obvious. Rule 23(d) requires that there be no greater than a forty-eight-hour separation period in potential life-imprisonment cases such as the instant one, but permits the parties to consent to a longer delay. That subsection does not require, however, that the defendant's consent be personal, in writing, or preceded by the court asking certain questions to assure the defendant's complete understanding of the consequences of the decision, as in other sections of Rule 23 dealing with consent to waiver of a jury trial or to a reduced number of jurors. See V.R.Cr.P. 23(a) (providing that defendant may waive jury trial in signed writing or in open court, with consent of court and prosecuting attorney, as long as court addresses defendant personally in open court to assure defendant's understanding that defendant can participate in selection of twelve jurors who must unanimously agree on guilt rather than have court alone decide guilt if jury is waived); V.R.Cr.P. 23(b) (providing that parties may stipulate in writing to less than twelve jurors). This is a reflection of the fact that although Rule 23(d) safeguards constitutional rights — ensuring trial by an impartial jury — its specific time constraints on the separation period are not constitutionally imposed. Indeed, as indicated above, amendments to Rule 23(d) have loosened those constraints in light of scheduling concerns and the recognition that there are other ways to limit the potential for, and to discover and eliminate, any juror taint. See, e.g., Reporter's Notes — 1995 Amendment, V.R.Cr.P. 23 (noting

that amendment eliminated absolute right to pick jury and proceed to trial immediately in felony cases but created opportunity for supplemental examination to address concerns of juror taint).

¶ 11. Here, as noted, at a status conference after jury selection had already been set for January 8, the court asked defense counsel if setting the trial for January 29 "made sense," to which defense counsel responded, "Yes," and then, "Great, thank you," after confirming that defendant's trial would be first up that day. This brief colloquy between the court and defense counsel plainly demonstrated counsel's acquiescence to scheduling defendant's trial twenty-one days after the jury was selected. The rule does not require defendant's personal consent; nor does it require the court to confirm the parties' apparent acquiescence to a delay beyond forty-eight hours. Thus, even if we were to assume error, there certainly was no obvious error regarding defendant's consent in this case.

¶ 12. Nor was there any obvious error as to the other components of Rule 23(d), which entitle the parties to conduct a supplemental examination of the jurors regarding a separation period exceeding forty-eight hours and to make challenges for cause based on any such examination. In this case, the trial court admonished the jurors following jury selection not to discuss the case with anyone or to do any independent research before the trial. Further, the court told the jurors not to read or listen to any news about the case, and to report to the court if they were exposed to any such material. Three weeks later, when the jurors returned for defendant's trial, the court explicitly asked them before the trial began whether any of them had "heard anything about the case or the parties or learned anything about it or done any independent research since" the jury selection. The court then stated for the record that all of the jurors were indicating that they had not. Hearing that, defense counsel did not assert defendant's right to a supplemental examination.

¶ 13. ■ As with the consent component of the rule, Rule 23(d) does not specifically require the trial court to apprise the parties of their right under the rule to examine the jurors following a delayed separation period. Therefore, even if we were to assume that the court erred by not confirming defense counsel's disinterest in reexamining the jurors following the separation period, any

such error was not obvious, and thus there was no plain error. Moreover, though we need not examine the other aspects of the plain-error analysis in light of our conclusion that any error was not obvious, we note that defendant has failed to demonstrate, beyond the three-week delay itself, "the existence of any intervening events which might have been capable of prejudicing the deliberative function of the jury." *State v. Fortier*, 149 Vt. 599, 602, 547 A.2d 1327, 1329 (1988) (finding no abuse of discretion in court proceeding after forty-seven-day delay between jury selection and misdemeanor trial where defendant did not object to going forward, court briefly questioned jurors before trial, and defendant failed to demonstrate existence of any prejudicial intervening events).

¶ 14. ■ Given the plain language of Rule 23(d), we decline to adopt a position that would essentially grant a defendant a new trial as a matter of law on occasions when the trial court did not actively confirm either defendant's consent to a jury separation longer than that set forth in the rule, or, following any such delay, defendant's waiver of his right to reexamine the jurors regarding the delay period and potentially to assert challenges for cause. We caution, however, that there may be circumstances where a defendant's acquiescence to delayed proceedings is less clear. Hence, we note that the better practice is for the trial court to: (1) confirm that the parties are in fact consenting to a longer delay; (2) emphasize that the jurors are to avoid any news and not research the case during any separation period between jury selection and trial; (3) question the jurors about anything they may have heard or learned about the case following a separation period; (4) ensure that the parties are offered an opportunity to examine the jurors following a separation period; and (5) inquire whether either party has any challenges for cause based on any such examination.

### III. Double Jeopardy

¶ 15. Next, defendant argues that double-jeopardy constraints bar him from being convicted based on a single alleged assault, for both sexual assault, in violation of 13 V.S.A. § 3252(a)(1), and sexual assault of a vulnerable adult, in violation of 13 V.S.A. § 1379(b)(1). He asks this Court to vacate the sexual assault conviction and remand the matter for resentencing on the sexual

assault of a vulnerable adult conviction. We vacate the sexual assault conviction but deny defendant's request that we remand the matter for resentencing.

¶ 16. ■ The law in this area is well settled, although individual cases can present close questions. The Double Jeopardy Clause, which has been incorporated into the Fourteenth Amendment and applies to the states, see *Benton v. Maryland*, 395 U.S. 784, 795 (1969), provides that no person may "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. Because legislative bodies are empowered to define crimes and fix punishments, but courts may not impose more than one punishment for the same offense, "the Clause is best understood . . . as limited to assuring that the court does not exceed its legislative authorization." *State v. Neisner*, 2010 VT 112, ¶ 11, 189 Vt. 160, 16 A.3d 597 (quotation omitted). The Clause does not preclude the Legislature from imposing multiple punishments, "but its intent to do so must be clear." *State v. Grega*, 168 Vt. 363, 382, 721 A.2d 445, 458 (1998). Hence, "[w]hen a defendant is tried in a single trial for two statutory offenses that criminalize the same conduct, whether or not a conviction and sentence may be had under each statute is a question of legislative intent, not constitutional prohibition." *Id.*

¶ 17. ■ When, as in this case, there is no explicit statement of legislative intent to impose multiple punishments, "we apply as a rule of statutory construction the test first enunciated by the Supreme Court in *Blockburger v. United States*, 284 U.S. 299, 304 (1932)." *State v. Ritter*, 167 Vt. 632, 632, 714 A.2d 624, 625 (1998) (mem.). Under the *Blockburger* test, which seeks "to divine whether the legislature intended to punish two separate offenses or one," *Grega*, 168 Vt. at 382, 721 A.2d at 458-59, we consider two offenses to be the same offense for double-jeopardy purposes unless *each* offense "requires proof of a fact which the other does not." *Blockburger*, 284 U.S. at 304. If this test is not satisfied, we must presume that the Legislature did not intend to authorize the imposition of cumulative punishments for the two offenses. *Grega*, 168 Vt. at 384-85, 721 A.2d at 460. This presumption may be overcome, but only by clear contrary legislative intent. *Id.* at 385, 721 A.2d at 460.

¶ 18. ■ Here, neither of the statutes at issue explicitly permits cumulative punishments for both offenses based on the same

conduct. Thus, we apply the *Blockburger* test. The statute criminalizing sexual abuse of a vulnerable adult provides that no person, regardless of whether that person has actual knowledge of the victim's vulnerable status, "shall engage in sexual activity with a vulnerable adult if: (1) the vulnerable adult does not consent to the sexual activity; or (2) the person knows or should know that the vulnerable adult is incapable of" resisting or consenting to the sexual activity. 13 V.S.A. § 1379(b). This offense plainly requires proof of a fact — that the victim is a vulnerable adult — not required for a conviction under the sexual assault provision charged in this case, which provides that "[n]o person shall engage in a sexual act with another person and compel the other person to participate · in a sexual act . . . without the consent of the other person." 13 V.S.A. § 3252(a)(1).

¶ 19. ■ The reverse is not true, however. As the offenses were charged in this case, every element that must be proved for a conviction of sexual assault under § 3252(a)(1) must also be proved for a conviction of sexual assault of a vulnerable adult under § 1379(b). See *Neisner*, 2010 VT 112, ¶ 12 (stating that our focus in applying *Blockburger* test is "on the elements of the crimes as they were charged"). It is true that a charge under § 3252(a)(1) requires proof of a "sexual act" that includes genital contact, while a charge under § 1379(b) may be based on "sexual activity" akin to lewd and lascivious conduct. Compare *id.* § 3251(1) (defining "sexual act") with *id.* § 1375(6) (defining "sexual act" identically to § 3251(1)), and *id.* § 1375(7) (defining "sexual activity" as sexual act or lewd and lascivious conduct). In this case, however, although the State's information alleged that defendant was a person who engaged in unconsented "sexual activity" with a vulnerable adult, the information labeled the charge as "sexual assault" of a vulnerable adult and indicated that the penalty for the offense was imprisonment for not more than twenty years and a fine of not more than $10,000. Under the vulnerable-adult statute, this is the penalty that may be imposed "if the sexual activity involves a sexual act," 13 V.S.A. § 1379(c)(2), as opposed to the maximum sentence of five years and a $5000 fine "if the sexual activity involves lewd and lascivious conduct," *id.* § 1379(c)(1). As noted, the definitions of "sexual act" in the vulnerable-adult statute, *id.* § 1375(6), and the sexual assault statute, *id.* § 3251(1), are identical.

¶ 20. The State's prosecution of defendant at trial was consistent with a charge under § 1379(c)(2). The complainant testified that defendant had sexual intercourse with her involving penis to vagina contact. Defendant did not testify or call any witnesses, but the police detective who interviewed him testified for the State that defendant had told him that he was not able to have sexual intercourse with the complainant so he placed his fingers into her vagina. Thus, all of the evidence concerning the assault described a "sexual act" as opposed to "sexual activity" in the nature of lewd and lascivious conduct.

¶ 21. ■ Moreover, although the trial court defined both the term "sexual act" and the term "sexual activity" in instructing the jury on the elements of the sexual-assault-of-a-vulnerable-adult charge, the jury convicted defendant of both offenses based on the single act as to which evidence was presented. Thus, the jurors necessarily concluded that defendant engaged in a sexual act with the victim, allowing the court to impose the higher sentence under § 1379(c)(2) sought by the prosecution in its information. In short, considering the actual vulnerable-adult charge in this case and the sentence imposed for the jury's conviction on that charge, the sexual-assault charge did not require any proof of a fact or element not included in the vulnerable-adult charge. Cf. *State v. Wiley*, 2007 VT 13, ¶ 11, 181 Vt. 300, 917 A.2d 501 (applying *Blockburger* test and concluding that Legislature intended to allow multiple punishments for same conduct where information alleged that sometime during two-month time period defendant willfully committed lewd act on child with intent to appeal to his sexual desires, in violation of 13 V.S.A. § 2602, and that defendant intentionally engaged in repeated, compelled sexual acts with that child, in violation of 13 V.S.A. §§ 3252, 3253(a)(9)).

¶ 22. In this respect, the case is similar to *Neisner*, where, at "first blush," it appeared that each of the two crimes charged — giving false information to a law enforcement officer and impeding a public officer — included an element that the other did not. 2010 VT 112, ¶ 14. However, because the hindering act underlying the impeding charge was the giving of false information, which formed the basis of the other charge, the crimes were effectively the same as specifically charged in that case. *Id.* ¶¶ 14-15. Accordingly, we held that, "[a]s prosecuted in this case, defendant could not be convicted and sentenced for the crimes of giving false information to a law enforcement officer and impeding an officer

without running afoul of the Double Jeopardy Clause." *Id.* ¶ 16. The same is true here.

¶ 23. The presumption under *Blockburger*, then, is that the Legislature did not intend to permit cumulative punishments for the two offenses, at least as they were charged and prosecuted in this case. As noted, "[t]he presumption may be overcome, but only by a clear indication of a contrary legislative intent, such as an explicit provision that the penalty is to apply cumulatively." *State v. Hazelton*, 2006 VT 121, ¶ 39, 181 Vt. 118, 915 A.2d 224 (quotation omitted).

¶ 24. In attempting to distinguish *Hazelton* — a case in which we held that the elements of the offense of engaging in a sexual act with an unmarried minor less than sixteen years old, in violation of § 3252(a)(3), are the same as the elements of the offense of committing an unconsented sexual assault, in violation of § 3252(a)(1)(A), see 2006 VT 121, ¶ 24 — the State argues that the penalties for the two charged offenses in the instant case, unlike the offenses in *Hazelton*, differ. In *Hazelton*, we stated that there was no clear expression of the Legislature's intent to permit cumulative punishments for the offenses at issue, noting that "the statute simply provides a generally applicable penalty of a fine and up to twenty years imprisonment for any one of the four sexual offenses disjunctively listed in § 3252(a)(1) through (4)." *Id.* ¶ 39; cf. *Ritter*, 167 Vt. at 633-34, 714 A.2d at 625-26 (recognizing that separately enumerated aggravating factors that independently allow conviction of second-degree aggravated domestic assault under 13 V.S.A. § 1044(a) each require proof of fact that others do not, but refusing to apply *Blockburger* presumption allowing multiple punishments because defendant did not commit multiple acts of domestic assault, there was substantial overlap among statute's aggravating factors, and applying *Blockburger* assumption would mean that significant number of defendants committing single acts of domestic assault would be charged with multiple offenses).

¶ 25. Here, as the State points out, a person convicted of sexual assault under § 3252(a)(1) is subject to a minimum sentence of not less than three years and a maximum sentence of life, as well as a fine up to $25,000, *id.* § 3252(f)(1), while a person convicted of sexual assault of a vulnerable adult under § 1379(b) is subject to a sentence of not more than twenty years, with no minimum, and a fine up to $10,000, *id.* 1379(c)(2). According to the State, it defies

reason for the Legislature to impose a lesser sentence for the greater crime — sexually assaulting a vulnerable adult — unless it intended to allow cumulative punishments.

¶ 26. We review the history of the statutes at issue to see if that may shed some light on the Legislature's intent. At the time § 3252 was first enacted in 1977, the punishment for sexual assault was not more than twenty years, with no minimum, and a fine not to exceed $10,000. See 1977, No. 51, § 1. That punishment remained unchanged for sexual assaults not involving special circumstances until 2006, when the Legislature enacted "An Act Relating to Enhancing Sentences for and Preventing Risks Posed by Dangerous Sexual Offenders," which, among other things, set the current punishment for sexual assault. 2005, No. 192 (Adj. Sess.), § 10. This Act, also known as the "Sexual Violence Prevention Act," *id.* § 1, was aimed at reducing crimes of sexual violence, in part, by enhancing sentencing — including adding indeterminate life sentences for enumerated sex crimes — and expanding treatment for sexually violent offenders, *id.* § 3.

¶ 27. Turning to the vulnerable adult statute, § 1379 stemmed from a 1985 law entitled "An Act Relating to Abuse of the Elderly and Disabled Adults," which was aimed at protecting elderly and disabled adults from neglect, physical and mental abuse, and exploitation, but contained no explicit sexual-abuse provisions. 1985, No. 78, §§ 1-2. Initially, the punishment for abusing or exploiting an elderly or disabled adult was imprisonment of not more than one year, a fine of not more than $10,000, or both. *Id.* § 13. In 1993, after those provisions were transferred from Title 18 to Title 33, see 1989, No. 148 (Adj. Sess.), § 2, the Legislature expanded the definitions of abuse and exploitation to include "sexual activity," which was defined to mean either a sexual act as defined in § 3251 or lewd and lascivious conduct. 1993, No. 100, § 1. The definition of "abuse" included any sexual activity between an elderly or disabled adult and a caregiver, and the definition of "exploitation" included any sexual activity with a disabled or elderly adult when the elderly or vulnerable adult did not consent or the actor knew or should have known that the elderly or vulnerable adult was incapable of consenting or resisting. *Id.* The punishment for exploitation was imprisonment for not more than eighteen months or a fine not to exceed $10,000, or both, while the punishment for a caregiver engaging in sexual activity was set at not more than two years imprisonment, a fine of not more than $10,000, or both. *Id.* § 8.

¶ 28. In 2005, the year before the maximum penalty for sexual assault under § 3252 was increased from a twenty-year maximum to an indeterminate life sentence, the Legislature updated the statutes related to offenses against vulnerable adults in a law entitled "An Act Relating to Criminal Abuse, Neglect, and Exploitation of Vulnerable Adults." In this Act, the Legislature transferred the offenses associated with abuse and exploitation of vulnerable adults from Title 33 to Title 13 and enhanced the penalties for those offenses. See 2005, No. 79. In doing so, the Legislature cited statistics for its finding that "[v]ulnerable adults are one of the most abused segments of our population." *Id.* § 1. The Legislature stated that the purpose of the Act was not only to "enhance[ ] the ability to prosecute persons under criminal law who abuse vulnerable adults," but also "to focus attention on the crucial role that prevention and training services can play to intervene at an early stage and ensure that vulnerable adults are not abused at all." *Id.* The Act stated that the maximum penalty for any unconsented-to sexual act with a vulnerable adult would be imprisonment for not more than 25 years or a fine of not more than $10,000.00, or both, if the sexual activity involved a sexual act. *Id.* § 2. It is noteworthy that, as mentioned above, this maximum term of imprisonment was five years greater than the then-existing maximum penalty for sexual assault of an adult without consent under § 3252.

¶ 29. Neither this Act nor any of its predecessor acts explicitly indicate whether the Legislature intended for the penalties to be cumulative with punishment for more general sex crimes. We further note that, as they currently stand, the statutory provisions established by the Act are inconsistent with respect to how the penalties imposed compared to penalties imposed under more general provisions for similar crimes. For example, a person who commits an assault of a vulnerable adult, as defined in 13 V.S.A. § 1376(b), may be imprisoned for not more than two years or fined not more than $2000, or both, while a person convicted of simple assault under 13 V.S.A. § 1023(b) may be imprisoned for not more than one year or fined more than $1000, or both. Similarly, a person who commits an aggravated assault of a vulnerable adult, as defined in § 1376(c), may be imprisoned for not more than twenty years or fined not more than $10,000, or both, while a person convicted of aggravated assault under 13 V.S.A. § 1024(a)(1) or (2) may be imprisoned for not more than fifteen years and

fined not more than $10,000, or both. Thus, in any assault cases where the victim is a vulnerable adult, a prosecutor would have the option of charging the vulnerable adult statute and obtaining a sentence beyond that allowed by the comparable general sexual-assault statute. Until 2006, that would also have been true for sexual assault of a vulnerable adult. That is also true with respect to § 1379's prohibition against lewd and lascivious conduct with a vulnerable adult. The possible penalty for lewd and lascivious conduct with a vulnerable adult — up to five years imprisonment and a $10,000 fine, 13 V.S.A § 1379(c)(1) — is somewhat greater than those for general lewd and lascivious conduct — up to five years and a $300 fine, 13 V.S.A. § 2601.

¶ 30. The fact that the Legislature has generally set greater penalties for vulnerable-adult provisions as compared to provisions of equivalent general crimes suggests, if anything, that the Legislature did not intend double punishments for both offenses. As the State points out, however, since the penalties for sexual assault under § 3252 were enhanced significantly in 2006, a year after the enactment of § 1379, a prosecutor now no longer has the option of seeking a higher penalty with respect to sexual assault of a vulnerable adult. The State contends not only that it makes no sense for the punishment for sexual assault of a vulnerable adult to be less than the punishment for sexual assault generally, but also that by preventing the State from charging both crimes in cases of sexual assault against a vulnerable adult, we would essentially be making the sexual act component of § 1379 super-fluous because no prosecutor would bring a charge under the statute for sexual assault of a vulnerable adult when they could bring a sexual assault charge under the general statute — with the potential for obtaining a higher sentence while needing to prove one less element.

¶ 31. However, the section under which the defendant was charged with sexual abuse of a vulnerable adult, 13 V.S.A. § 1379, also criminalizes sexual conduct other than sexual assault. Section 1379(a) makes it a crime for any person who acts as a caregiver for a vulnerable adult, whether paid or unpaid, to engage in any sexual activity with that adult. It authorizes a defendant to raise consent by the vulnerable adult in question as an affirmative defense to such a charge, but only in cases in which the vulnerable adult himself or herself either hired, supervised, or directed the caregiver. This offense carries a maximum penalty of

two years in jail or a fine of $10,000 or both. This section is arguably the most important part of this statute, as it criminalizes conduct that would otherwise be lawful, providing protections for vulnerable adults that are not available to them through any other criminal statute. Thus, it is highly unlikely that, as the dissent and the State argue, our decision here will result in state's attorneys choosing never to prosecute sexual abuse of vulnerable adults. We acknowledge that, because § 3252 provides a greater penalty than § 1379(b) for sexual assault on any nonconsenting person and does not require proof that the victim is a vulnerable adult, a rational state's attorney will likely charge sexual assault, rather than sexual assault on a vulnerable adult, in most instances. It is within the Legislature's power to address this issue.

¶ 32. ■■■ Examining both §§ 1379 and 3252, we cannot conclude that the arguably irrational disparity in punishments between them with respect to sexual assault demonstrates a clear legislative intent to allow cumulative punishments under the circumstances of this case. As the U.S. Supreme Court stated in disallowing multiple charges for rape and felony murder in the course of a rape under the *Blockburger* test: "To the extent that the Government's argument persuades us that the matter is not entirely free of doubt, the doubt must be resolved in favor of lenity." *Whalen v. United States*, 445 U.S. 684, 694 (1980); see *State v. Waters*, 2013 VT 109, ¶¶ 27, 32, 195 Vt. 233, 87 A.3d 512 (stating that ambit of criminal statutes should be resolved in favor of "due-process-infused rule of lenity"); *Grega*, 168 Vt. at 387, 721 A.2d at 462 (holding, in rejecting contention that Legislature intended to allow multiple punishments for both felony murder and predicate offense, that "settled law requires that ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity" (quotations omitted)). The Legislature, of course, is free to amend § 1379 and make clear its intent, if that is the case, to allow double punishments under § 3252 and § 1379 for the same conduct, or to increase the penalties for sexual offenses against vulnerable adults if its failure to do so in 2006 was an oversight.

¶ 33. Like the State, the dissent points out the absurdity of having punishment for sexual assault of a vulnerable adult be less than that for regular sexual assault — unless we assume that the Legislature intended cumulative punishments. Essentially, the dissent would conclude that a "clear" legislative intent to impose

double punishments materialized in 2006 when the Legislature increased the punishment for regular sexual assault, thereby making it greater than the punishment for sexual assault of a vulnerable adult. It is more likely that not increasing the vulnerable-adult provision at that time resulted from simple oversight rather than from an intent on the part of the Legislature to allow double punishments for those crimes. Certainly, the fact that the vulnerable-adult penalty was not increased at that time does not constitute the level of clear intent necessary to satisfy our adopted *Blockburger* analysis and to overcome the rule of lenity.

¶ 34. The dissent agrees with much of our analysis but asserts that we have failed to delve deeply enough in determining legislative intent. According to the dissent, we have failed to recognize a "method of discerning legislative intent in a double-jeopardy analysis," which "look[s] at the nature of the social norms sought to be protected," *post*, ¶ 56, and that has been followed by a number of state courts. The cases cited by the dissent do not support its position.

¶ 35. ▮ The first case cited by the dissent is *People v. Robideau*, 355 N.W.2d 592 (Mich. 1984), *overruled by People v. Smith*, 733 N.W.2d 351 (Mich. 2007). In *Robideau*, the Michigan Supreme Court abandoned the *Blockburger* test and adopted in its place a test based on a number of general principles, including that "[s]tatutes prohibiting conduct that is violative of distinct social norms can generally be viewed as separate and amenable to permitting multiple punishments." *Id.* at 603-04. But, as the dissent acknowledges, *Robideau* was overruled by *Smith*. Although the court in *Smith* did not explicitly overrule the use of "social norms" as a method of discerning legislative intent, it "granted leave . . . to consider whether *Blockburger v. United States . . .* or *People v. Robideau . . .* set[ ] forth the proper test in Michigan for determining when multiple punishments are barred on double jeopardy grounds." 733 N.W.2d at 352. *Robideau* had barred multiple convictions not only for offenses that were lesser-included offenses of one another, but also for so-called "cognate" offenses that shared only some elements and that each required proof of something that the other offense did not. In *Smith*, the Michigan Supreme Court narrowed this approach. Following an exhaustive analysis of both federal and Michigan case law, the court overruled *Robideau* and concluded, just as this Court has, that *Blockburger* sets forth the proper test to determine when multiple

punishments are barred on double-jeopardy grounds. *Id.* at 363-64. In arriving at this conclusion, the *Smith* court quoted some "general principles" of the now-rejected test that had been adopted in *Robideau* — most notably the same general principle relied on by the dissent: " 'Statutes prohibiting conduct that is violative of distinct social norms can generally be viewed as separate and amenable to permitting multiple punishments.' " *Id.* at 362 (quoting *Robideau*, 355 N.W.2d at 604). At best from the perspective of the dissent, the "social norms" general principle is in serious doubt in Michigan following *Smith*.

¶ 36. The next case the dissent cites is *State v. Gardner*, 340 S.E.2d 701 (N.C. 1986), which concluded "that the legislature intended that the crime of breaking or entering and the crime of felony larceny pursuant to that breaking or entering be separately punished." *Id.* at 714. In support of this conclusion, the court noted that "[t]he statutory history of the two crimes predates the turn of the twentieth century," and that courts in North Carolina had "uniformly and frequently held, from as early as the turn of the century, that breaking and/or entering and larceny are separate and distinct crimes." *Id.* at 712-13. In discerning legislative intent, the court concluded that the "many years of uniform construction have been acquiesced in by our legislature." *Id.* at 713. Obviously, the situation in that case is in marked contrast to ours here, which involves a recent statute and no history of case law concluding that the two crimes are separate and distinct for purposes of punishment. The *Gardner* court made only a fleeting reference to what it described as the "separate and distinct social norms [protected by the statutes barring], the breaking into or entering the property of another and the stealing and carrying away of another's property." *Id.* at 712.

¶ 37. It is also noteworthy that the *Gardner* decision is inconsistent with our own case law. In *Grega*, unlike *Gardner*, we followed the principle set by *Whalen*, 445 U.S. at 694-95, that double jeopardy precludes punishment for both a felony and its predicate crime, holding that the defendant could not be punished for both felony murder and the predicate crime of rape. 168 Vt. at 384-85, 721 A.2d at 460. The court in *Gardner* took pains to limit the *Whalen* decision only to charges of felony murder, and not to other cases in which a defendant is charged with two crimes, one of which is clearly based on and includes the elements of the other. In North Carolina, defendants may be convicted of

both offenses in such cases, except for felony murder, unless the legislature makes it clear that it does not intend that there will be double convictions and punishments.

¶ 38. ▮ Next, the dissent cites *State v. Montoya*, 2013-NMSC-020, ¶ 52, 306 P.3d 426, which overruled prior case law and held that double-jeopardy principles precluded cumulative punishment for both voluntary manslaughter and causing great bodily harm by shooting at a motor vehicle. In so holding, the court explained that it had recently rejected the "narrow view" of a previous case that the two statutes at issue "were enacted to address different social evils, aggravated battery to protect against bodily injury and attempted murder to protect against loss of life." *Id.* ¶ 50 (citing *State v. Swick*, 2012-NMSC-018, ¶ 29, 279 P.3d 747). The court also noted that it had recently "reaffirmed the established principle that lenity applies in cases of ambiguity regarding the reach of criminal statutes, because reasonable minds can differ as to the Legislature's intent in punishing the [ ] two crimes." *Id.* ¶ 51 (quoting *Swick*, 2012-NMSC-018, ¶ 30). In other words, this case stands for two principles that are directly opposed to what the dissent asserts in this case — that "[i]n considering whether two statutes seek to protect different social norms, the definition of the norm should be construed narrowly," *post*, ¶ 58, and that the rule of lenity has little force in a double-jeopardy analysis, *post*, ¶ 54.

¶ 39. Next, the dissent cites *State v. Garza*, 2014 SD 67, 854 N.W.2d 833, which held, also inconsistent with our own case law as stated in *Grega*, that "the Legislature intended to authorize cumulative punishment for violations of felony murder and the underlying felony of arson." *Id.* ¶ 19. In reaching that holding, the *Garza* court, in direct contrast to *Grega*, explicitly "decline[d] to apply the holding of *Whalen*" that courts must "consider how the offenses were proven at trial," stating that "the *Whalen* analysis is not in line with our precedent of interpreting statutes for double jeopardy purposes." *Id.* ¶¶ 16-17. Indeed, unlike this Court, the Supreme Court of South Dakota acknowledged that its method for dealing with double-jeopardy challenges differed from the federal approach. *Id.* ¶ 13. *Garza* is also substantively distinguishable from the instant case because, in that case, "the plain language of the statutes reveals that each statutory offense requires proof of an element not required to establish a violation of the other." *Id.* ¶ 14.

¶ 40. Next, the dissent cites *State v. Hughes*, 212 P.3d 558 (Wash. 2009), in which the Washington Supreme Court reversed the court of appeals and held that double-jeopardy principles preclude convictions for both child rape and rape in the second degree when the victim is physically helpless or mentally incapacitated. *Id.* at 563. Remarkably, the dissent cites this case in support of its position, despite the Washington Supreme Court's holding, which is very similar to our own in this case, and that court's explicit statement that its court of appeals "construe[d] the purpose of the statutes too narrowly." *Id.* at 562.

¶ 41. Finally, the dissent cites *Nowack v. State*, 774 P.2d 561 (Wyo. 1989), in which the Wyoming Supreme Court held that the defendant could be prosecuted, based on a single act, for driving under the influence with serious bodily injury resulting, and for aggravated assault and battery. *Id.* at 562. The court did not discuss the *Blockburger* test other than briefly stating in a footnote that, under the test, the defendant had committed two offenses. *Id.* at 567 n.8. In finding legislative intent to allow cumulative punishment of the two offenses despite the lack of any clear statement of intent, the Wyoming court relied on a principle of statutory construction presuming that a legislative body that creates two distinct statutes intends to permit cumulative punishment. *Id.* at 567. That is not the test we have adopted in Vermont, as discussed.

¶ 42. In short, none of these cases support the dissent's position. Indeed, those cases either suggest the opposite position from that taken by the dissent or are grossly inconsistent with our own established case law. Despite the fact that our longstanding double-jeopardy law requires a clear expression of legislative intent when the *Blockburger* test is not met, the dissent would find such clear intent based solely on the fact that, taking a narrow view, sexual assault and sexual assault of a vulnerable adult concern differing social norms. That position is contrary to our double-jeopardy case law.

¶ 43. Given our conclusion that there is a double-jeopardy violation, we are left with the issues of which conviction to vacate and whether to remand the matter for resentencing. As to the first issue, both defendant and the State ask this Court to vacate the sexual-assault conviction. Cf. *Neisner*, 2010 VT 112, ¶ 16 (declining to reach issue of which conviction to dismiss to avoid double-jeopardy constraints because defendant appealed trial

court's denial of his motion to dismiss one particular conviction). We concur with this suggestion. Therefore, we need not address the laws on which of the two convictions should be vacated.

¶ 44. As to the second issue, we reject defendant's request for resentencing, which relies primarily on the trial court's comment at sentencing that the charged sentences "were two very serious crimes perpetrated against a vulnerable adult." Undoubtedly, the court noted defendant's commission of two serious crimes simply because he was convicted of two crimes. The court specifically acknowledged it had the power to place defendant on probation, but emphasized that incarceration was necessary in this case because of the seriousness of his actions in forcing sex on a vulnerable adult. Indeed, the court stated that it would have given defendant a sentence of at least three years to serve even if there had been a recommendation for a probationary sentence. Given the court's comments, and the independent sentences imposed, there is no basis to remand the matter for resentencing.

## IV. Excited Utterance

¶ 45. Finally, defendant argues that the trial court abused its discretion by admitting the hearsay testimony of the complainant's brother under the excited utterance exception. On direct examination, complainant's brother testified that he spoke to the complainant the same day that the assault occurred. He stated that she was crying and angry, and he responded in the negative when asked if he had ever seen her that upset. After the attorneys sparred over the brother's recollection of the timing of his conversation with the complainant, the brother further testified, over defendant's hearsay objection, that his sister told him that defendant had lured her into his apartment under false pretenses and then, as the brother described what his sister told him, "helped himself to her." In response to defendant's motion for a new trial, the trial court rejected defendant's contention that the court improperly admitted this testimony under the excited utterance exception, stating that a sexual assault was certainly a startling event and that the brother testified that he spoke to complainant on the same day the assault occurred and that she was more upset than he had ever seen her.

¶ 46. Defendant argues that there was an insufficient foundation to admit the hearsay testimony under the excited utterance exception because: (1) the brother testified that complainant was

upset by discussing the assault rather than by the assault itself; and (2) the complainant herself testified that she was only a "little nervous" and that she was upset because of how her brothers would react, not because of what happened. We find no abuse of discretion in admitting the testimony. See *State v. Jackson*, 2008 VT 71, ¶ 9, 184 Vt. 173, 956 A.2d 1126 ("Our review of trial court evidentiary rulings is deferential, and we reverse only when there is an abuse of discretion resulting in prejudice.").

¶ 47. ▉ An excited utterance that is admissible as an exception to the hearsay rule is defined as follows: "A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." V.R.E. 803(2). The statement "need not be made immediately after the startling event," but the declarant's excited condition, which is the key inquiry, must be caused by the startling event. *Jackson*, 2008 VT 71, ¶ 9.

¶ 48. ▉ Here, complainant's brother testified that he visited complainant on the same day of the assault and found her more upset than he had ever seen her. When he testified that she was upset, angry, and crying, the prosecutor asked him whether "it was talking about the incident with [defendant] that upset her or something else?" He responded: "Talking about that, yeah." This response to the prosecutor's question does not demonstrate that the complainant's excitement stemmed merely from discussing the assault rather than the assault itself. Moreover, although the complainant testified that she was "still a little nervous" when she spoke to her brother because he might yell at her, she is a person with mental disabilities who also used the word "nervous" in describing how she felt during the sexual assault. Considering the challenges that the complainant faced in testifying, and the court's role in assessing the credibility of the witnesses, the court did not abuse its discretion in admitting the brother's testimony based on its determination that the complainant was in an excited state when she spoke to him due to the sexual assault that had occurred earlier the same day.

*The sexual assault conviction and the sentence imposed for that conviction are vacated; the sexual assault of a vulnerable adult conviction and the sentence imposed for that conviction are affirmed.*

¶ 49. **Dooley, J.,** concurring and dissenting. I concur on the issues of the separation period and hearsay testimony, but I

dissent on the double jeopardy issue. The majority's reasoning on this issue appears on the surface to be a clear and logical application of existing double-jeopardy precedent and analysis. This is one of those cases, however, where the use of our historic reasoning and analysis produces a result that is otherwise indefensible. The result of the majority's decision is the judicial repeal of a crime. As the State emphasized in this case, no prosecutor will ever again charge a defendant with the crime of sexual abuse of a vulnerable adult even if a defendant admits to having perpetrated exactly that crime. If we were required to reach that result as a matter of federal constitutional law for which we are not the final arbiter, I would have to go along despite my misgivings. Instead, the majority has reached that result based on a conclusion that it implements the intent of the Legislature, a conclusion that is clearly wrong. No legislature would create an important crime on the basis that it will never be charged by a prosecutor. The majority's result cannot be consistent with legislative intent. I would affirm the trial court decision.

¶ 50. I recognize that the Legislature can fix the result in a number of ways, and the decision may have the salutary effect of a closer examination in the future of crimes that are defined similarly with overlapping elements. I do not believe, however, that the opportunity to repair the damage and use it as a lesson for future drafting justifies this result. We are left with a distorted view of legislative intent and how to discern it in future cases. For this reason, I dissent.

¶ 51. I begin with my points of agreement with the majority. As the majority observes, whether overlapping crimes allow for multiple convictions and sentences turns on legislative intent. *State v. Neisner*, 2010 VT 112, ¶ 12, 189 Vt. 160, 16 A.3d 597. The Double Jeopardy Clause, U.S. Const. amend. V, prohibits courts from imposing multiple sentences for the same offense but does not preclude the Legislature from defining separate but overlapping crimes and authorizing cumulative punishments. *Id.* ¶ 11. The intent of the Legislature to do so, however, must be clear. *Id.* ¶ 12. The longstanding test for determining legislative intent was enunciated by the U.S. Supreme Court in *Blockburger v. United States*, 284 U.S. 299, 304 (1932), and has been adopted by this Court. *State v. Ritter*, 167 Vt. 632, 632, 714 A.2d 624, 625 (1998) (mem.). The central inquiry under this test is whether the two offenses involved are "the same" for the purposes of double

jeopardy. *Blockburger*, 284 U.S. at 304. Two offenses are the same unless each offense contains an element of proof that the other does not. *Id.* If this initial "elements test" is not satisfied, the two offenses are the same and the Legislature is presumed to have prohibited cumulative punishments for those offenses. *State v. Grega*, 168 Vt. 363, 384-85, 721 A.2d 445, 460 (1998). The presumption, however, may be rebutted by a " 'clear indication of contrary legislative intent,' " *id.* at 385, 721 A.2d at 460 (quoting *Albernaz v. United States*, 450 U.S. 333, 340 (1981)), through the "language, structure, or legislative history of the statutes." *Id.* In my opinion, the majority did not adequately consider the language, structure, and legislative history of the enactments in reaching its conclusion.

¶ 52. The majority begins its examination of the two offenses of sexual assault, 13 V.S.A. § 3252, and sexual abuse of a vulnerable adult, 13 V.S.A. § 1379, by applying the *Blockburger* test, and it properly concludes that § 1379 requires proof of an element that § 3252 does not — that the victim is a vulnerable adult — while § 3252 requires no such independent element of proof. Essentially, proving all the elements of § 1379 necessarily involves proving all the elements of § 3252. The majority thus concludes that the presumption under *Blockburger* is that the Legislature did not intend to impose cumulative punishments for these two offenses. I agree with this analysis.

¶ 53. From there, the majority explores the legislative history in search of clear indication of the Legislature's intent. Finding no express statement in the legislative history, the majority concludes that the *Blockburger* presumption is not overcome and that therefore the cumulative sentences cannot stand. The majority then briefly considers related statutory provisions under the vulnerable-adult act and the penalties they impose, as compared to their more general counterparts. The majority merely observes that the penalties are "inconsistent" and that no conclusion can be drawn that rebuts the presumption. *Ante*, ¶ 29. This is where I disagree.

¶ 54. I take issue with the majority's "mechanical" application of the *Blockburger* test, *State v. Swick*, 2012-NMSC-018, ¶ 21, 279 P.3d 747, and its inadequate examination of the legislative history it has presented. Finding no express statement, the majority resorts to the rule of lenity without considering other applicable principles of statutory construction, *Albernaz*, 450 U.S. at 342

(stating that rule of lenity "comes into operation at the end of the process of construing what [the Legislature] has expressed, not at the beginning" (quotation omitted)), which place this matter beyond a mere "guess." See *Grega*, 168 Vt. at 388, 721 A.2d at 462 (observing that "lenity means that the Court will not interpret . . . a criminal statute so as to increase the penalty that it places on an individual when such an interpretation can be based on no more than a guess as to what [the Legislature] intended" (alteration in original) (quotation omitted)). Essentially, the majority reads the Legislature's silence as ambiguity that can and should be resolved in defendant's favor. I cannot end the inquiry there. See *Albernaz*, 450 U.S. at 340-42 (holding that legislative silence does not imply ambiguity requiring application of rule of lenity).

¶ 55. In this state, where committee records are limited and no record of floor debate exists, determining legislative intent often can be difficult. Legislative intent need not be illuminated merely by an express statement but may also be discovered by other means, including statutory interpretation. See *State v. Handy*, 2012 VT 21, ¶ 29, 191 Vt. 311, 44 A.3d 776 ("Our rules of statutory construction are aimed at discerning legislative intent."); see also *In re Carroll*, 2007 VT 19, ¶ 9, 181 Vt. 383, 925 A.2d 990 (stating that where "doubt exists" about legislative intent, "[t]he intent should be gathered from a consideration of the whole statute, the subject matter, its effects and consequences, and the reason and spirit of the law" (quotation omitted)). Indeed, *Grega* instructs us to look at the language and structure of the relevant statutes. 168 Vt. at 386-88, 721 A.2d at 460-62. Aside from noting the inconsistencies in penalties imposed under the related statutory provisions, the majority makes no attempt to determine legislative intent from other available sources.

¶ 56. One method of discerning legislative intent in a double-jeopardy analysis is to look at the nature of the social norms sought to be protected. The U.S. Supreme Court first recognized this method of analysis in *Albernaz*, where it considered the "separate evils" presented by the crimes of importation and distribution of marijuana and concluded that because Congress sought to regulate two "diverse societal harms" that it intended the resulting sentence to be cumulative when violated in a single

offense.[1] 450 U.S. at 343. The Supreme Court reiterated this test in *United States v. Woodward*, 469 U.S. 105 (1985), where it examined two statutes, one dealing with false statements to a federal agency and another addressing failure to report transportation of currency in excess of $5000 into the United States, and concluded that "Congress' intent to allow punishment under both [statutes] is shown by the fact that the statutes 'are directed at separate evils.' " *Id.* at 109 (quoting *Albernaz*, 450 U.S. at 343).

¶ 57. A number of state courts have followed this rationale and used the social-norms test to either reinforce or rebut the *Blockburger* presumption. If the social norms are separate and distinct, the offenses are not the same and the legislative intent is to permit cumulative punishments. See, e.g., *People v. Robideau*, 355 N.W.2d 592, 604 (Mich. 1984) (stating that "[s]tatutes prohibiting conduct that is violative of distinct social norms can generally be viewed as separate and amenable to permitting multiple punishments"), *overruled by People v. Smith*, 733 N.W.2d 351 (Mich. 2007)[2]; *State v. Montoya*, 2013-NMSC-020, ¶ 32, 306 P.3d 426 (using "language, history, and subject of the statutes" to "identify the particular evil sought to be addressed by each offense" in effort to rebut *Blockburger* presumption (quotation omitted)); *State v. Gardner*, 340 S.E.2d 701, 713 (N.C. 1986) (considering distinct social norms protected by prohibition on breaking and entering and felony larceny predicated on breaking and entering as indicative of legislature's intent to impose cumulative sentences, thus overcoming *Blockburger* presumption); *State v. Garza*, 2014 SD 67, ¶ 19, 854 N.W.2d 833 (reinforcing conclusion that arson and felony murder allow cumulative punishments because they are "directed toward protecting different social norms and achieving different policies" (quotation omitted)); *State*

---

[1] I acknowledge that *Albernaz* is a case in which the elements of the statutes met the *Blockburger* test because each had an element not in the other. *Albernaz*, 450 U.S. at 339. The Supreme Court noted that the different elements triggered a presumption that the crimes were not the same, but that the presumption could be overcome by clear evidence of contrary legislative intent. *Id.* at 340. The analysis discussed in the text applies whether or not the *Blockburger* test is met, but of course where it is met defendant has a much larger burden in order to prevail.

[2] *Robideau* was overruled by *Smith* for its abandonment of the *Blockburger* "same elements" test, *Smith*, 733 N.W.2d at 363, but the court in *Smith* never explicitly abandoned the use of "social norms" or other means of discerning legislative intent to rebut the *Blockburger* presumption. In any event, I find the analysis of *Robideau* applicable.

*v. Hughes*, 212 P.3d 558, 562-63 (Wash. 2009) (considering purposes of statutes in determining whether single act of intercourse could be punished cumulatively under both rape and child rape statutes); *Nowack v. State*, 774 P.2d 561, 567 (Wyo. 1989) (discerning legislative intent by looking at purpose of statutes and noting that "[w]here independent but overlapping statutes are directed at separate evils, cumulative punishments are intended.") (quotation omitted).

¶ 58. In considering whether two statutes seek to protect different social norms, the definition of the norm should be construed narrowly. *Swafford v. State*, 1991-NMSC-043, ¶ 32 n.7, 810 P.2d 1223 ("Both rape and incest broadly can be understood as protecting society against a single evil — aberrant sexual behavior. That construction would raise a strong presumption that the legislature intended but one conviction and sentence for a single episode implicating both offenses. . . . [S]uch broad interpretation eviscerates the legislature's intent to proscribe the narrower, distinct evils . . . by way of different statutory schemes."); *State v. Hargrove*, 1989-NMSC-012, ¶ 20, 771 P.2d 166 (concluding that incest and criminal sexual penetration of children, although both involving sexual misconduct, are not same because incest statute prohibits intercourse within the prohibited degree of consanguinity and criminal sexual penetration of children prohibits intercourse with individuals who by their age are unable to consent).

¶ 59. The location of the statutes in the larger statutory scheme may also provide some guidance in drawing this line. Statutes located in the same code section likely were intended to protect the same social norms, while statutes located in distinct code sections, while otherwise possessing overlapping elements, likely were intended to protect different social norms and permit cumulative punishment. See *Hughes*, 212 P.3d at 562 (concluding that rape of child and rape of vulnerable adult are same offenses in part because both offenses are found in same code section entitled "Sex Offenses").

¶ 60. The majority distinguishes these cases on their facts and consequently reasons that they do not support the point that this "social norms" test may be applicable here. *Ante*, ¶¶ 35-42. But the facts of the individual cases and the attendant conclusions on whether cumulative punishments were appropriate in those cases are not relevant here. Certainly the legislative enactments in the

individual states are likely to vary, making an application of this test highly fact-specific. What is applicable in the context of this case is that we have a method for discerning legislative intent, which has been adopted in several state and federal courts, that is useful when confronted with two statutory provisions that are difficult to reconcile. Moreover, what these cases tell us is that we cannot stop short of looking at the purpose behind the statutory provisions and what the Legislature was seeking to protect.

¶ 61. Here, the legislative history makes clear that 13 V.S.A. § 1379 was adopted not to prevent sexual assault generally but to protect vulnerable adults from abuse and exploitation. Section 1379 is found in Title 13, chapter 28, "Abuse, Neglect, and Exploitation of Vulnerable Adults," which contains statutory provisions prohibiting against vulnerable adults abuse, abuse by unlawful restraint and unlawful confinement, neglect, sexual abuse, financial exploitation, and exploitation of services. 13 V.S.A. §§ 1376-1381. Legislative findings supporting the passage of the 2005 Act indicate that "[v]ulnerable adults are one of the most abused segments of our population" and that reports of abuse have been on the rise. 2005, No. 79, § 1. Additionally, "statistics show that more than 90 percent of people with developmental disabilities will experience sexual abuse at some point in their lives," and individuals with severe mental illness are victims of violent crimes at "more than 11 times the rate for the general population." *Id.* Abuse against nursing home residents is an "increasing concern," as these residents "are abused by the very people who are supposed to care for them[,] . . . [r]eports of sexual and physical abuse often are not made promptly, and existing state and federal safeguards do not adequately protect residents from potentially abusive nursing home employees." *Id.* In passing the Act, the Legislature sought to "*enhance*[ ] the ability to prosecute persons under criminal law who abuse vulnerable adults." *Id.* (emphasis added).

¶ 62. While § 1379 is located in a chapter of the code that protects the elderly and vulnerable adults, § 3252 is located in chapter 72, which broadly covers sexual assault. This, along with the legislative findings and stated purposes of the vulnerable-adult act, demonstrates that the overriding goals of the Legislature were to curtail the widespread abuse — sexual or otherwise — of vulnerable adults, increase the rate of reporting such incidents, and protect vulnerable adults from abuse and exploitation by

those charged with their care. Furthermore, the Legislature's goal was to enhance prosecution of offenses against vulnerable adults, not to enhance prosecution of sexual abuse specifically. If anything is discernible from this history it is that the Legislature found the protection of vulnerable adults of particular concern. The purpose of the vulnerable-adult act would be poorly served if the Legislature did not intend cumulative punishments under § 1379 and § 3252.

¶ 63. Another piece of this analysis is a look at the penalties imposed for the two offenses. For example, if a base penalty is imposed for one crime and the penalty is then increased for aggravating circumstances, the likely intent is that these crimes are the same and cannot be imposed cumulatively. See *People v. Kulpinski*, 620 N.W.2d 537, 540 (Mich. Ct. App. 2000) (observing that where statute does not involve hierarchy of offenses with penalties increasing as offenses increase in severity, legislature intended cumulative punishment); *Swafford*, 1991-NMSC-043, ¶ 33 (stating that "[t]he quantum of punishment also is probative of legislative intent to punish" and that "[i]f the punishment attached to an offense is enhanced to allow for kindred crimes, these related offenses may be presumed as a single offense"). As the Michigan Supreme Court observed, the clear intent is that the "Legislature has taken conduct from the base statute, decided that aggravating conduct deserves additional punishment, and imposed it accordingly, instead of imposing dual convictions." *Robideau*, 355 N.W.2d at 604.

¶ 64. Here, sexual assault under § 3252 is the base statute, and sexual abuse of a vulnerable adult under § 1379 involves an aggravating circumstance — the victim being a vulnerable adult. Yet § 1379 imposes a *lesser penalty* than § 3252. In a reverse scenario, where the aggravating conduct receives a greater penalty, such an alignment is evidence that the Legislature intended to prohibit cumulative punishment. By the same reasoning, where the aggravating conduct receives a lesser penalty, as is the situation here, such an alignment is evidence that the charges are separate and the punishment is cumulative. Cf. *Gardner*, 340 S.E.2d at 713 (concluding that legislature could not have intended "absurd result" of offense with higher penalty to be lesser-included offense subsumed by offense with lower penalty).

¶ 65. The corollary to statutes protecting separate and distinct social norms being seen as different offenses is that statutes

protecting the *same* social norms, being the *same* crime for the purposes of double jeopardy, often are considered lesser-included offenses. Indeed, the *Blockburger* analysis serves to identify such lesser-included offenses and protect defendants from cumulative sentencing under these schemes. See, e.g., *Grega*, 168 Vt. at 384-85, 721 A.2d at 459-60 (concluding that because aggravated sexual assault is lesser-included offense to aggravated murder that offenses are same under *Blockburger* test). As the Supreme Court of North Carolina noted in *Gardner*, however, one offense may appear to be a lesser-included offense of the other, based on the penalties imposed and the elements of proof, but that if the offenses serve different purposes, they may, in reality, be separate offenses for the purposes of imposing cumulative sentences. 340 S.E.2d at 713-14. The majority's reading effectively establishes § 3252 as a lesser-included offense to § 1379 since all the elements of the general sexual assault statute are subsumed within the vulnerable-adult statute. Again, this defies logic, particularly given that § 1379 has a lower penalty.

¶ 66. The majority rejects the State's claim that reading § 1379 and § 3252 as the same offense creates the illogical result of rendering the vulnerable-adult statute superfluous because the majority finds no clear statement in the legislative history. *Ante*, ¶¶ 31-32. Yet, one way to determine legislative intent is by considering whether a statutory interpretation renders a portion of the statute mere surplusage, *In re Lunde*, 166 Vt. 167, 171, 688 A.2d 1312, 1315 (1997), as well as if the interpretation produces absurd or irrational results. *State v. Brunner*, 2014 VT 62, ¶ 11, 196 Vt. 571, 99 A.3d 1019.

¶ 67. A good example of this analysis is found in *State v. Ritter*, a double-jeopardy case in which the defendant was charged with two separate counts of second-degree aggravated domestic assault arising out of the same incident. The governing statute, 13 V.S.A. § 1044, lists several aggravating factors that elevate the crime of domestic assault to second-degree aggravated domestic assault. Although based on only one incident, the information charged separate crimes for each of the two aggravating factors. Because the factors were separate elements, they satisfied the *Blockburger* test and triggered the presumption that the Legislature intended cumulative punishments. We concluded that, despite the *Blockburger* presumption, a determination that the Legislature allowed the imposition of two sentences would produce the absurd

result of punishing the defendant for each aggravating factor under the statute. *Ritter*, 167 Vt. at 633, 714 A.2d at 625-26. Thus, we found the necessary intent to rebut the *Blockburger* presumption based on the "absurd results" produced under the elements test. If the presumption in *Ritter* was overcome on the basis that the result was absurd, it should be overcome in this case. The majority here fails to address the State's argument.

¶ 68. The majority undermines its own argument in examining the statutory provisions established by the vulnerable-adult act and how the penalties imposed therein relate to the penalties imposed in the general provisions of the same crimes. For example, assault of a vulnerable adult under 13 V.S.A. § 1376(b) is punishable by a maximum of two years imprisonment, a maximum fine of $2000, or both; simple assault under 13 V.S.A. § 1023(b) is punishable by a maximum of one year imprisonment, a maximum fine of $1000, or both. Similarly, aggravated assault against a vulnerable adult under 13 V.S.A. § 1376(c) imposes maximum sentences of twenty years imprisonment, a $10,000 fine, or both, while aggravated assault under 13 V.S.A. § 1024(b) imposes maximum sentences of only fifteen years imprisonment, a $10,000 fine, or both. Finally, the penalty schemes for lewd and lascivious conduct under 13 V.S.A. § 2601 (general), 13 V.S.A. § 1379(c)(1) (vulnerable adult), and 13 V.S.A. § 2602(b) (child) increase as the severity of the crime increases from an offense against the general population, up to a vulnerable adult, and then a child. While the majority's conclusion is that the statutory provisions are "inconsistent" with respect to the nature of the penalties, *ante*, ¶ 29, I read these provisions as a clear statement that the Legislature finds offenses against vulnerable adults to be more severe than their general counterparts. A conclusion that sexual abuse against a vulnerable adult is an exception, being a less-severe crime than its general counterpart, is untenable.

¶ 69. Finally, the majority points out that, prior to 2006, sexual abuse of a vulnerable adult under § 1379 was subject to a more severe penalty than general sexual assault under § 3252, but that in 2006 the Legislature enhanced the sentence under § 3252, creating the penalty scheme we have now, with sexual abuse of a vulnerable adult a crime having a less severe punishment. *Ante*, ¶ 28. Rather than recognizing the result that the 2006 penalty enhancement produced — a result that is illogical if we do not accept the punishments as cumulative — the majority rationalizes

that the Legislature's failure in increasing the penalty for sexual abuse of a vulnerable adult was a simple "oversight." *Ante,* ¶ 33. Unlike the majority, I cannot accept that the Legislature's inaction with respect to § 1379 was a mistake. As we frequently have stated, we presume that the Legislature passes and amends laws "in light of relevant judicial precedents and with knowledge of prior legislation on the same subject." *State v. Read,* 165 Vt. 141, 147, 680 A.2d 944, 948 (1996). We must presume that the Legislature was aware of the penalties under other sexual-assault crimes when it enhanced the penalty for § 3252. Cf. *In re Town of Killington,* 2003 VT 87A, ¶ 13, 176 Vt. 60, 838 A.2d 98. In a conflict of competing presumptions, I choose the presumption that creates a rational result.

¶ 70. In closing, I emphasize that my analysis is not at all inconsistent with our prior decisions applying the *Blockburger* presumption. In fact, our discussion in *Ritter* indicates the need for a more in-depth examination of the legislative intent than the majority supplies here. As noted above, *supra,* ¶ 66, the *Blockburger* presumption in *Ritter* was rebutted not by any statement found within the legislative history but by a showing that the outcome under *Blockburger* produced an illogical result. 167 Vt. at 633, 714 A.2d at 625-26. The majority here nonetheless rejects the State's argument to that effect and stops short of conducting a full assessment of the legislative intent. Consequently, we are left with a statutory scheme that defies logic and contravenes the Legislature's intent to impose cumulative sentences. For these reasons, I respectfully dissent.